v.

**DEPARTMENT OF EDUCATION,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 1, 2010.
Decided Aug. 5, 2010.
Publication Ordered Oct. 1, 2012.

BEFORE: LEADBETTER, President Judge, and BROBSON, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge BROBSON.

This matter arises under the Professional Educator Discipline Act (Act).[1] Petitioner M.T., acting *pro se*, petitions for review of an adjudication by the Professional Standards and Practices Commission (Commission), revoking immediately M.T.'s professional educator certification. For the reasons that follow, we affirm the Commission's adjudication in part and remand the matter to the Commission for reconsideration of the discipline imposed in light of our opinion.[2]

## BACKGROUND

M.T. was an instrumental music teacher and band director for a school district (District). In Spring 2005, one of M.T.'s former students (Student) disclosed to her parents that she and M.T. engaged in a sexual relationship over a period of time from 2001 through 2004,[3] while she was a student in the District. Based on these allegations, the District suspended M.T. without pay in April 2005.[4]

The Department initiated its action against M.T. on November 9, 2007, by filing a Notice of Charges (Notice) with

M.T., pro se.

Nicole M. Werner, Harrisburg, for respondent.

Charles N. Sweet and David F. Conn, New Britain, for intervenor Palisades School District.

1. Act of December 12, 1973, P.L. 397, 24 P.S. §§ 2070.1a–2070.18a.

2. This Court's standard of review of an order of the Commission is limited to considering whether the Commission erred as a matter of law or violated any constitutional rights, and whether any necessary factual findings are not supported by substantial evidence. 2 Pa. C.S. § 704; *Bowalick v. Dep't of Educ.*, 840 A.2d 519 (Pa.Cmwlth.2004).

3. Student began high school in the District in the 2000–2001 school year. During that year, M.T. did not engage in inappropriate conduct with Student while she performed in the marching band as a saxophone player. The conduct at issue began during Student's sophomore year—the 2001–2002 school year. Student graduated from high school in the District in 2004.

4. Shortly after Student graduated, Student's parents complained to the District about what the parents felt were improper and inappropriate communications between M.T. and Student. As a result, the District issued a formal written reprimand to M.T. in July 2004, instructing him to cease all contact with Student.

the Commission.[5] The Department asserted that M.T., in his capacity as an instrumental music teacher and band director for the District during the 2001–2004 school years, "engaged in a pattern of inappropriate conduct of a sexual nature with [a] high school student." Paragraph 3 of the Notice sets forth the specific acts supporting the Department's decision to charge M.T. The Department charged M.T. with immorality, negligence, intemperance, cruelty, incompetence, sexual abuse or exploitation, and violations of the Code of Professional Practice and Conduct (including provisions prohibiting the acceptance of gifts by teachers and prohibiting sexual conduct between a teacher and student). The Department also claimed that M.T. posed a threat to the health, safety, and welfare of students.

Following three days of hearings, the Hearing Officer issued his recommendation to the Commission (Recommendation). The Recommendation included findings of fact and conclusions of law. The Hearing Officer's factual findings are extensive and detailed—115 separate paragraphs in all. In brief, the Hearing Officer found that M.T. and Student began a personal relationship of escalating intensity, beginning in Student's sophomore year of high school. The relationship continued up to and after Student's graduation from high school, culminating in Student's disclosure of the relationship to her parents in Spring 2005, while she was in college. Student's sophomore year of high school was marked by hugging and holding hands with M.T. (Recommendation 2–5.) In Student's junior year of high school, the sexual nature of the relationship escalated to the point where M.T. "began 'humping' or 'grinding' his body, specifically his genitals, against

[Student's] body and licking her ears." (Recommendation at 6.)

M.T. professed his affection, and sometimes love, for Student through gifts—*e.g.*, music, a necklace, a poem, etc.—and through e-mails and text messages. (*Id.* at 5–7, 12, 13, 15–16.) The sexual nature of the relationship again intensified during Student's senior year of high school. M.T. had Student masturbate him, they showered together during an out-of-state band trip, and they performed oral sex on each other. (*Id.* at 12–14.) By this point in their relationship, the Hearing Officer found, "anything other than intercourse was free reign." (*Id.* at 14.)

M.T. continued his pursuit of Student after her graduation from high school. The text messaging continued, and the two made plans to meet. (*Id.* at 17–18.) When Student's parents attempted to put a stop to the text messaging and the liaison, M.T. found other ways to communicate with Student, even though the District had verbally instructed him to cease all contact with Student. (*Id.*) M.T. went so far as to send Student a mobile phone, which they could use to communicate while she was away at school. (*Id.* at 19.) M.T. visited Student at college. (*Id.*) By January 2005, Student decided to cut off communication with M.T and returned the mobile phone. In March 2005, Student informed her parents of the relationship. (*Id.* at 20.)

Based on these findings and conclusions, the Hearing Officer recommended that "[a]ll of [M.T.'s] teaching certificates should be revoked and never reinstated." (Recommendation at 67.) The Hearing Officer concluded that the Department sustained its burden of proof with respect to all but two of the charges—(1) that M.T.

---

**5.** M.T.'s reproduced record does not contain numbered pages. Consequently, we will reference citations to items in the reproduced record in as accurate a manner as possible. The Notice is in "Record # 1, Tab 1, Exhibit A" to the Petition for Review.

violated a provision of the Code of Professional Practice and Conduct prohibiting the acceptance of gifts, and (2) that M.T. constituted a present danger to the health, safety, and welfare of students. In rejecting the Department's claim that M.T. posed a present danger to students, the Hearing Officer concluded that M.T. presented no danger to students so long as M.T. is not seeking employment as a teacher.

Both M.T. and the Department filed exceptions to the Hearing Officer's Recommendation. In his exceptions, M.T. disputed: (1) the sufficiency of the evidence the Hearing Officer relied upon in developing his factual findings; (2) the factual support for the Hearing Officer's conclusions that M.T. was guilty of immorality, negligence, intemperance, cruelty, sexual abuse or exploitation, and a violation of the Code of Professional Practice and Conduct; (3) the legal conclusion that instant messages between M.T. and Student were inappropriate and unprofessional; and (4) the imposition of the penalty of certificate revocation. M.T. also raised the following questions: (1) whether M.T.'s due process rights were violated as a result of a delay between the inception of the alleged improper conduct and the date of the Department filing its Notice, and (2) whether the doctrine of laches precluded the Department from initiating its charges against M.T.

The Department raised one exception to the Recommendation. It challenged the Hearing Officer's conclusion that M.T. did not pose a threat to the health, safety, or welfare of students or other persons in schools within the Commonwealth. The Department filed the exception to secure immediate revocation of M.T.'s teaching certificate, because, absent a finding that M.T. posed such a threat, M.T.'s appeal of the Commission's adjudication to this Court would, by law, operate as a stay of the discipline imposed.[6]

In its adjudication, the Commission denied M.T.'s exceptions and granted the Department's exception. It adopted all of the Hearing Officer's findings of fact and all but one of the Hearing Officer's conclusions of law. In sustaining the Department's exception, the Commission rejected the Hearing Officer's legal conclusion that M.T. did not pose a present threat to students or other persons in schools within the Commonwealth (Recommendation at 66, ¶ 21.) The Commission concluded that the circumstances warranted imposition of immediate discipline. In its Amended Order dated September 30, 2009, the Commission ordered the Department to revoke immediately M.T.'s certification. As a result, M.T.'s appeal of the Commission's adjudication to this Court did not operate under the Act as an automatic stay of the Commission's order to revoke his certification.

In his brief in support of his petition for review to this Court, M.T. raises the following issues: (1) whether the Hearing Officer misinterpreted witness testimony and exhibits, which, in turn, unduly influenced the Commission in its decision to revoke M.T.'s teacher's certificate; (2) whether the Commission erred in concluding that M.T. was guilty of immorality, negligence, cruelty, incompetence, intemperance, violation of the Code of Professional Practice and Conduct, and sexual abuse and exploitation; (3) whether the Commission erred in concluding that the Department satisfied its burden of proving its charges by a preponderance of the evi-

6. Section 15 of the Act, added by Act of December 14, 1989, P.L. 612, *as amended*, 24 P.S. § 2070.15(b).

dence; (4) whether the Commission improperly placed the burden of proof on M.T.; (5) whether the Commission's adjudication violates M.T.'s constitutional liberty interests or right to equal protection with regard to his teacher's certificate; (6) whether the Commission submitted a complete record to this Court; and (7) whether the Commission either committed laches or failed to issue its decision in accordance with applicable statutory provisions such as to render its decision invalid.

## DISCUSSION

### A. Challenges to Factual Findings

M.T. challenges certain factual findings by the Hearing Officer, which the Commission accepted in its adjudication.[7] M.T. points to parts of various witnesses' testimony whose credibility the Hearing Officer and the Commission, in turn, accepted. The focus of M.T.'s argument appears to be an attempt to impugn the credited testimony based upon details the Hearing Officer included in some of his factual findings, which M.T. contends other evidence in the record contradicts.

For example, the Hearing Officer made various factual findings relating to an incident that occurred in M.T.'s office. (Recommendation at 7–9.) The Hearing Officer determined that M.T. kept a sleeping bag in his office that he would place on the floor, such that part of the sleeping bag rested under part of M.T.'s desk. The Hearing Officer found that M.T. would engage in sexual activity with Student on the sleeping bag. With regard to one incident, the Hearing Officer found that

one of M.T.'s colleagues knocked on his locked office door while M.T. was engaging in sexual conduct in his office with Student. When M.T. did not respond, the colleague used her key to open the door. According to the testimony of the colleague, M.T. had removed his shirt, so that he was only wearing an undershirt. M.T. obstructed the colleague's view of the office and kept the door in a partially-open position, thereby preventing the colleague from entering the office. The colleague testified that she saw no one in the room other than M.T.

■ According to Student's testimony regarding this incident, M.T. instructed Student to remain hidden for a certain number of seconds and then to exit through the back door of the *band room*. The Hearing Officer's factual finding provides that M.T. told the student to exit through the back door of *the office*. M.T. appears to claim that this discrepancy between the testimony and the Hearing Officer's finding is reversible error because the Hearing Officer's finding is not supported by substantial evidence.[8]

M.T. also suggests that the Hearing Officer erred in crediting Student's testimony about the sleeping bag incident. He explains that the colleague wanted to drop off audition results. M.T. testified during the hearing that this would have occurred during the week of January 16, 2002. The date, he claims, coincided with an evening school board meeting at which he was required to discuss construction of the band room. M.T. reasons, then, that *his*

---

7. The Commission is the ultimate fact finder under Section 14 of the Act, added by Act of December 14, 1989, P.L. 612, *as amended*, 24 P.S. § 2070.14(b)-(c), and, consequently, the Commission's role requires it to "judge the weight and credibility of evidence and witnesses." *Gow v. Dep't of Educ., Prof's Stan-*

dards & Practices Comm'n, 763 A.2d 528, 532 (Pa.Cmwlth.2000), *allocatur den.*, 566 Pa. 651, 781 A.2d 149 (2001).

8. M.T. does not make this precise argument, but we believe that this is the gist of his argument.

testimony shows that he stayed after school for that purpose and decided to take a nap, which behavior, he asserts, supports his version of the incident and not Student's. Pointing to his assertion that his colleague must have come to his door in January 2002, he contends that Student's testimony indicating that the incident occurred after a band trip to Florida, which occurred in March 2003, makes Student's recollection of the incident impossible to believe.

As to this particular incident and testimony relating to it, M.T. claims that the Hearing Officer improperly placed the burden of proof on M.T., because the Hearing Officer based his credibility findings on the *absence* of any testimony by M.T. that there were *no* auditions in March 2003. M.T., however, misunderstands the Hearing Officer's reasoning. The Hearing Officer did not misapply a burden of proof. Rather, the Hearing Officer was providing a basis for his credibility determination regarding the conflicting testimony of the witnesses. The Hearing Officer was merely providing a reason why he believed Student's testimony and disbelieved M.T.'s testimony.

■ Generally speaking, the fact finder, as sole arbiter of credibility, has the responsibility to resolve conflicts in testimony arising from inconsistencies in an individual's testimony and inconsistencies arising from the testimony of two or more witness. *Johnson v. Workers' Comp. Appeal Bd. (Abington Mem'l Hosp.)*, 816 A.2d 1262 (Pa.Cmwlth.2003). This Court is bound by the fact finder's credibility determinations.

With respect to the sleeping bag incident, the Commission, as ultimate fact finder, agreed with the Hearing Officer's credibility determinations and simply believed Student while finding M.T.'s testimony not credible. We find no error with regard to the factual findings relating to the sleeping bag incident. To the extent there is any discrepancy over whether M.T. instructed Student to leave through a back door to his office or a back door to the band room, this discrepancy is not material and, thus, does not justify a decision from this Court reversing the factual findings or the Hearing Officer's credibility determinations.

Like the sleeping bag incident, M.T. attempts to poke holes in the Hearing Officer's factual finding relating to an incident that Student testified occurred in the "choral costume closet." In his Recommendation, however, the Hearing Officer found that the incident occurred in "a room between the choral and band rooms." (Recommendation at 12, ¶ 55.) M.T.'s bone of contention appears to be that the District did not construct a formal choral costume closet until April 30, 2004, after the alleged incident took place. Because Student testified that the incident occurred in a choral costume closet that was not constructed until after the alleged incident, M.T. claims that the Hearing Officer erred in finding that the incident occurred at all.

But the Hearing Officer recognized the discrepancy in Student's testimony regarding this particular incident and reasoned that Student's reference to the costume closet was to the area used for the storage of such costumes before the construction of the formal costume closet. (Recommendation at 48–49.) Accordingly, the Hearing Officer adequately addressed this alleged discrepancy. We thus do not see a reason to overturn the Hearing Officer's decision to find credible Student's testimony that the incident of abuse actually happened—whether in a "costume closet" or a "room between the choral and band rooms."

M.T. also challenges the Hearing Officer's crediting of Student's testimony concerning alleged sexual abuse that occurred in the school's "gold gym." M.T. argues that Student's testimony is incredible because, in addition to testifying regarding the incidents of sexual conduct between M.T. and herself in that area, Student also stated that people were free to walk into the area. M.T. asserts that Student's testimony that the incidents of sexual abuse actually happened in the gold gym is not credible because it is impossible to believe that such conduct occurred without anyone observing it. Again, however, we reiterate the rule that this Court is bound by the fact finder's credibility determinations. While M.T. may find it incredible that other persons never observed his conduct, the fact finder believed Student's testimony that the abuse occurred.

In light of the foregoing, we need not examine M.T.'s many other alleged inconsistencies in testimony or alleged flaws in the Hearing Officer's credibility determinations.[9] They are similar to the chal-

9. M.T. raises numerous additional and similar challenges to the Commission's factual findings. We briefly summarize those additional challenges below:

1. M.T. challenges the Hearing Officer's rationale for not believing the testimony of one of M.T.'s witnesses about the likelihood of M.T. having an opportunity to have sexual encounters with Student during a band trip. M.T. argues that the Hearing Officer discredited the testimony because the witness did not initially remember the name of the hotel where the band stayed during the trip. Nonetheless, the Hearing Officer believing the testimony of a Department witness whose recollection also needed to be refreshed.

2. M.T. challenges the Hearing Officer's decision to believe Student's testimony concerning an incident that took place at a ticket booth. Student testified that she accompanied M.T. from the band room to the ticket booth to retrieve a marimba. M.T. challenges Student's credibility based upon his own and another witness's testimony that: (1) the school did not own a marimba and (2) the band room was still under construction at the time of the incident.

3. M.T. challenges the Hearing Officer's finding of fact with respect to an incident in a locker room during a guard rehearsal. M.T. points to testimony of another student, the leader of the "guard," who stated that the "guard" never held practices in the gym. We note that the portion of Student's testimony M.T. seeks to discredit by raising this provides that the guard was rehearsing in the band room, not the gym. (Notes of Testimony (N.T.) at 31.)

4. M.T. challenges the Hearing Officer's findings of fact with respect to an incident in a uniform closet following the band room's construction. M.T. argues that Student testified that M.T. would lock that door and that the room contained racks at one end. M.T. points to conflicting testimony in the record to the effect that the room could not be locked from inside and that the room only contains "open-faced storage units."

5. M.T. challenges the Hearing Officer's findings of fact with respect to the frequency of sexual conduct between M.T. and Student (sometimes one to four times per week during the school day). M.T. points to evidence suggesting that M.T.'s schedule made such frequency of incidents impossible.

6. M.T. challenges the Hearing Officer's findings of fact with respect to a band trip to Florida. M.T. asserts that it is incomprehensible that no persons would have seen M.T. and Student entering a room or observed a liaison during that trip, because the band stayed at a hotel that had doors opening to face the street. M.T. also argues that Student's testimony that M.T. bought her a Mickey Mouse necklace during the trip conflicts with her admission that that she told people that she bought herself the necklace.

7. M.T. challenges the Hearing Officer's finding of fact with respect to an incident on a bus trip. The Hearing Officer found that M.T. and Student touched each other's genitals and that M.T. had Student masturbate him while they sat together on the bus. M.T. asserts that such conduct was not feasible and that the testi-

lenges that we address and reject above. M.T. cites to no authority that would permit this Court to act favorably on his challenges to the factual findings. Without such authority, we will not disturb those findings and the related credibility determinations based on alleged incidental inaccuracies regarding minor details of events.[10] Essentially, M.T. is requesting this Court to reweigh the evidence and make different findings and credibility determinations based upon these alleged conflicts in testimony and alleged inaccuracies as to incidental details. Our standard of review precludes such an approach to the review of the Commission's factual find-

ings. *Levering v. Workmen's Comp. Appeal Bd. (Buck Company, Inc.)*, 153 Pa. Cmwlth. 533, 621 A.2d 1178, *allocatur den.*, 536 Pa. 634, 637 A.2d 293 (1993).[11]

## B. Challenge to Poem

M.T. also challenges the Hearing Officer's admission into the record of a poem M.T. gave to Student. M.T. argues that the acceptance into the record of the poem without any demonstration of authenticity illustrated bias on the part of the Hearing Officer. We note that the exceptions M.T. filed to the Hearing Officer's Recommendation do not specifically address the grounds for his objection or

mony of some witnesses who stated that they sat next to or near M.T. and Student on the bus but never saw any such conduct supports his position that Student lied about the incident.

8. M.T. challenges the Hearing Officer's findings of fact dealing with testimony of Student's father about Student and M.T. practicing music behind closed doors. According to the father's testimony, M.T. explained that they practiced behind closed doors to avoid noise from the construction of the new band room. M.T. challenges the credibility of the statement, because construction on the new band room did not start until after the time the father testified these closed-door practices occurred.

9. M.T. challenges the Hearing Officer's findings of fact to the effect that M.T. gave Student numerous gifts during the course of the relationship. M.T. argues that Student's testimony is not believable, because she could produce none of the gifts, except for a poem (which M.T. claims that he established, through his testimony, he did not type), and that Student did not know where the gifts were at the time of her testimony.

11. M.T. challenges the Hearing Officer's findings of fact concerning meetings between M.T. and Student's father. M.T. pits his testimony on these meetings against the father's testimony, claiming that the meetings were not intended to express concern about M.T.'s behavior; rather, the father expressed only concern

about Student spending too much time with M.T. M.T. further points to the father's testimony that he did not see any inappropriate conduct between his daughter and M.T. at a pool party Student's family hosted at their house.

12. M.T. challenges the Hearing Officer's findings of fact concerning an instant message, which Student's father testified caused him to install spyware on Student's computer. M.T. takes issue with the authenticity of the instant message streams that the Hearing Officer accepted into the record, based upon his assertions that the timing of the installation of spyware and the discovery of a single instant message suggest that Student's father lied about or fabricated the instant messages.

13. M.T. challenges the Hearing Officer's findings of fact that M.T. used code words—"you know it," or "yki"—to express his romantic feelings toward Student. M.T. asserts that he used the expression "you know it" to boost Student's confidence and never used the phrase to mean "I love you."

10. We note that M.T. raised his credibility challenges in his post-hearing brief. In response, the Hearing Officer devoted approximately 14 pages of the Recommendation to explaining the reasoning behind his credibility determinations.

11. Although *Levering* arose in the context of a worker's compensation case, the rationale is equally applicable to our analysis in this case.

discuss the requirements for authentication of documents for the purpose of admission into the record. Consequently, we believe that M.T. has waived this issue.[12] Even if M.T. did not waive the issue, however, we are not convinced that the Hearing Officer erred in admitting the document over M.T.'s objection.

■ We note that Commonwealth agencies are not "bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received." 2 Pa.C.S. § 505. Here, the Department presented a document to Student, and she identified the document as a poem that M.T. gave to her at a regional band competition. (N.T. at 33–34.) Based on this testimony, and over the authenticity objection of M.T.'s counsel, the Hearing Officer admitted the document into the record of the proceeding. We discern no error in the Hearing Officer's decision to overrule the authenticity objection, as Student's testimony was sufficient to identify and authenticate the document even under the more rigorous standards of the Pennsylvania Rules of Evidence, which, as noted above, do not apply to the Commission's proceedings. *See* Pa. R. Evid. 901.

### C. Comparisons to Other Cases

M.T. next argues that the Hearing Officer erred in characterizing M.T.'s conduct as worse than other teachers whom the Commission has disciplined for inappropriate communications and contact with students. The Hearing Officer cited three examples of instances where the Commission found that a teacher's conduct justified a charge of immorality. (Recommendation at 38–29.) M.T. attempts to distinguish his case factually from the three cases that the Hearing Officer identified in his Recommendation.

We find the Hearing Officer's comparison of M.T.'s conduct to the conduct of other teachers persuasive, but not controlling. Even if the comparison is flawed, as M.T. claims, we do not believe it is such an integral part of the Hearing Officer's Recommendation that the flawed comparison justifies or necessitates reversal of the Commission's decision. M.T. offers no argument or legal support upon which we are inclined to rule otherwise. In any event, much, if not all, of M.T.'s objection to the comparison is based on his view of the facts in this case, not the facts as found by the Hearing Officer. As noted above, it is not our role to question the credibility determinations of the Hearing Officer and the findings of fact that are supported by substantial evidence.

M.T. engages in some comparisons of his own. He compares his case to *Boguslawski v. Department of Education*, 837 A.2d 614 (Pa.Cmwlth.2003), and three cases in which the Department found that a teacher had engaged in sexual contact with a student. The gist of M.T.'s argument is that in the referenced cases, someone witnessed the abuse, the teacher admitted the abuse, the teacher had been convicted of some criminal abuse, or the teacher "resigned in a questionable manner." M.T. argues that if this Court affirms the Commission, this will be the first case in which a teacher has lost his certificate based on "non-tangible" evidence. M.T. contends that the Court will be "lowering ... the standard of proof required in order to find an educator guilty of sexual abuse." (M.T. Br. at 52.)

**12.** The failure of a party properly to raise and preserve an issue before an administrative agency results in waiver of that issue before this Court. Pa. R.A.P. 1551; *Kelly v. Workmen's Comp. Appeal Bd. (DePalma Roofing)*, 669 A.2d 1023, 1025 (Pa.Cmwlth.1995).

We discern no lowering of the burden of proof in this case. The Department must establish that grounds for discipline exist by a preponderance of the evidence. *Boguslawski*, 837 A.2d at 617 n. 3. It is M.T. that asks this Court to adopt a new legal standard—*i.e.*, that the Department can *never* meet this burden in a disciplinary proceeding for sexual abuse in the absence of (a) testimony of a third-party witness to the abuse, (b) an admission of guilt, (c) a conviction, or (d) a resignation. We decline to adopt such a restrictive rule. It is up to hearing officers and the Commission to *weigh* the evidence presented to determine whether the Department has met its burden in a particular case. While credible testimony of a student describing the events of abuse may not be enough in every case to satisfy the Department's burden, we will not say that it can never be enough.

### D. Challenges to Legal Conclusions on Charges

M.T. challenges the Hearing Officer's and Commission's legal conclusions regarding the charges against him relating to immorality, negligence, intemperance, cruelty, incompetence, a violation of the regulations prohibiting sexual harassment and engaging in sexual relationships with students, and a violation of the regulation prohibiting sexual abuse and exploitation. We address his challenge to each charge *seriatim*.

#### 1. *Immorality*

The Commission has promulgated regulations to define terms in the Act that describe the conduct for which the Commission may impose discipline. 22 Pa. Code Ch. 237. Those regulations define "immorality" as "conduct which offends the morals of the Commonwealth and is a bad example to the youth whose ideals a professional educator ... has a duty to foster and elevate." 22 Pa.Code § 237.3. As the Department points out, this Court has held that a teacher's improper touching of two students in a sexual manner constituted immorality. *Boguslawski*, 837 A.2d at 618. Based upon the factual findings regarding the nature of the physical contact M.T. initiated with Student, we conclude that the Commission did not err in concluding as a matter of law that M.T.'s conduct was immoral.

#### 2. *Negligence*

The regulations define "negligence" as "continuing or persistent action or omission in violation of a duty," and "duty" is defined as something that "may be established by law, by promulgated school rules, policies or procedures, by express direction from superiors or by duties of professional responsibility." 22 Pa.Code § 237.8. The Commission agreed with the Hearing Officer's conclusion that M.T. was negligent in violating duties established by law and by M.T.'s supervisors. Specifically, the Hearing Officer concluded that M.T. violated a duty contained in the Code of Professional Conduct that prohibited sexual conduct with students, and he failed to comply with the directions of his supervisors to discontinue his contact with Student.

M.T. argues that he had no duty to obey a directive to cease contact with Student, because she was no longer a student of the District at the time the District gave him the directive. M.T. points to federal authority for the proposition that a school district has no power to intervene in a teacher-*former* student relationship. Even if this is true, the Commission also concluded that M.T.'s conduct violated the regulation at 22 Pa.Code § 235.10(3) and constituted an action in violation of duty. Consequently, we agree with the Commission that the findings support its conclu-

sion that M.T.'s conduct constitutes negligence, and we see no legal error to justify reversal on this ground.

### 3. *Intemperance*

■ The regulations define "intemperance" as "a loss of self-control or self-restraint, which may result from excessive conduct." 22 Pa.Code § 237.5. M.T. argues that the Commission erred in concluding that his conduct was intemperate because "in most cases [the alleged conduct was] disproven by multiple witnesses." As discussed above, substantial evidence supports the factual findings, which in turn support the conclusion that M.T. did indeed engage in sexual conduct with Student. As the Department argues, this Court has concluded that improper conduct that continues over a period of time can fall within the meaning of the phrase "excessive." *Gow*, 763 A.2d at 534. The record and findings clearly indicated that M.T. pursued his sexual activity with Student over a long period of time and in a chronic manner. We thus agree with the Department that it sustained its charge against M.T. that he behaved in an intemperate manner.

### 4. *Cruelty*

■ "Cruelty" is defined as "intentional, malicious and unnecessary infliction of physical or psychological pain upon living creatures, particularly human beings." 22 Pa.Code § 237.7. Whether M.T.'s conduct constituted cruelty is a question of law. *Landi v. West Chester Area Sch. Dist.*, 23 Pa.Cmwlth. 586, 353 A.2d 895, 897 (1976).

M.T. asserts that the Commission erred in concluding that his conduct constitutes cruelty. M.T. relies upon a prior decision of the Commission—*Pennsylvania Department of Education v. Bonello*, No. DI–95–13 (Jan. 2, 1996), in which the Commission, applying the above definition of "cruelty," found no evidence in the record to indicate that a teacher's use of explicit notes to make sexual advances toward a student constituted "cruelty." The Commission reasoned: "Although we accept the account in the Notice of Charges that the student became frightened by Mr. Bonello's advances, there is no evidence on the record before the Commission that indicates that Mr. Bonello *acted with a malicious intent to inflict pain.*" *Bonello* at 3 (emphasis added).

According to M.T., *Bonello* stands for the proposition that in order to make out a case for "cruelty," the Department must demonstrate that the teacher acted with malicious intent to inflict pain. M.T. does not offer a definition of what it means to act with malicious intent. He argues, however, that he acted only as a friend and mentor to Student. Essentially, he argues only that (1) the conduct did not occur, (2) he did not act with malicious intent, and (3) he did not inflict (intentionally or otherwise) psychological pain on the student.

■ In response, the Department does not attempt to distinguish *Bonello* or refer the Court to any other adjudication by the Commission wherein the Commission interprets and applies the definition of "cruelty" found in the regulations.[13] Instead, the Department refers us to the definition of "malicious," which Black's Law Dictionary describes as meaning "substantially certain to cause injury without just cause or excuse." Black's Law Dictionary 969 (7th ed.1999). The Department argues

---

13. "While an administrative agency is not bound by the rule of *stare decisis,* an agency does have the obligation to render consistent opinions, and should either follow, distinguish or overrule its own precedent." *The Standard Fire Ins. Co. v. Ins. Dep't,* 148 Pa.Cmwlth. 350, 611 A.2d 356, 359 (1992) (citation omitted).

that cruelty can involve both physical and psychological harm to a person and that, as a result of M.T.'s persistent sexual conduct with Student, Student became withdrawn from friends and family. The Commission, adopting the Hearing Officer's analysis, reasoned that M.T.'s conduct was cruel because it "was certain to cause psychological injury and was without just cause or excuse." (Recommendation at 43.)

In *Caffas v. Board of School Directors*, 23 Pa.Cmwlth. 578, 353 A.2d 898 (1976), a teacher appealed an order from the Pennsylvania Secretary of Education, sustaining a school board's decision to terminate a teacher's contract due to, *inter alia*, "cruelty." At that time, there was no regulation defining "cruelty." This Court, thus, resorted to a dictionary definition of the term, part of which included the following: " 'the intentional and malicious infliction of physical suffering upon living creatures, particularly human beings.' " *Caffas*, 353 A.2d at 900 (quoting Black's Law Dictionary 541 (rev. 4th ed.1968)). The current definition in the Commission's regulations is similar, except that it includes the additional modifier of "unnecessary infliction" and refers to "physical or psychological pain" instead of "physical suffering."

This Court concluded that the evidence of cruelty in *Caffas* was overwhelming. There was substantial evidence in the record to support the finding that the teacher subjected the children under his charge to physical and verbal abuse—"striking them on the head, wrestling them to the ground, propelling them into the walls and against furniture, shaking them and subjecting them to a humiliating form of horseplay referred to locally as 'red belly'," etc. *Id.* Apparently, however, the Secretary of Education struggled with the teacher's defense that he never actually intended to inflict suffering on the students. Faced with this concern, we opined:

> [T]he Secretary, apparently troubled by the defense in ... this case, that the teacher did not intend to inflict suffering on his students, provides his own rather awkward, but not plainly erroneous, definition of cruelty. We suggest to the Secretary that a fully adequate definition is that of Black's Law Dictionary 541 (rev. 4th ed.1968) ....
>
> *We point out that intent is not irrelevant, but that it may be inferred* from the facts and that denials of intent to inflict injury may be rejected, if belied by the actor's demonstrated conduct.

*Id.* (emphasis added); *see also Landi*, 353 A.2d at 897 (Pa.Cmwlth.1976) (same).

With this guidance, we must now apply the Commission's definition of "cruelty" to the facts in this case to determine whether the Commissioner erred as a matter of law in finding that M.T.'s conduct was "cruel." As noted above, in order to establish that M.T.'s conduct constituted cruelty under the Commission's regulations, the Department had the burden to establish (1) that M.T. actually inflicted either physical or psychological pain upon Student, and (2) that when inflicting such harm, M.T. acted intentionally, maliciously, *and* unnecessarily. We believe that the regulation requires that the Department not simply prove that an educational professional intentionally engaged in the conduct that causes pain, whether physical or psychological, but that he also acted with the malicious *intent* to inflict the pain that he caused. Such a finding of intent can be inferred by the person's conduct.

We have no trouble concluding that M.T. intentionally engaged in the deplorable conduct that led to the Commission imposing discipline. The Department, however, has failed to offer any argument, citation to the record, or a factual finding by the

Hearing Officer upon which the Commission could have concluded, by inference or otherwise, that M.T. *intended* to cause Student pain—physical or psychological. Nor can we conclude that it was reasonable for the Commission to infer from M.T.'s conduct that M.T. intended to inflict pain on Student. While we certainly do not condone M.T.'s conduct in this case, we are constrained to agree with M.T. that his conduct is not consistent with someone who intends to inflict physical and psychological pain.

Moreover, we agree with the Department that the inappropriate relationship between Student and M.T. was both physical and psychological. There is substantial record evidence to support the Hearing Officer's findings in this regard. We are not persuaded, however, that the Hearing Officer's finding of fact that Student "became withdrawn" is akin to a finding that Student suffered "psychological pain" as a result of M.T.'s conduct. The Department, however, hangs its hat on this single finding of fact by the Hearing Officer to support the charge of "cruelty." In the absence of a factual finding that Student actually suffered physical or psychological *pain* as a result of M.T.'s conduct, the charge of "cruelty" cannot stand under the Commission's definition of the term.

### 5. *Incompetence*

 The Code defines "incompetency" as "a continuing or persistent mental or intellectual inability or incapacity to perform the services expected of a professional educator." 22 Pa.Code § 237.4. M.T. asserts again that the record does not support the key factual findings regarding his sexual improprieties, but he also defends as competent his performance as a band director and music instructor. The Department has no response to his argu-

ment, and we must agree with M.T. that this provision is directed to the performance of a teacher's professional duties. Therefore, we believe that the Commission erred in concluding that the Department proved its charge of incompetence against M.T.

### 6. *Violations of Code of Conduct*

 M.T. also contends that the Commission erred in concluding that he violated two provisions of the Code: (a) accepting gifts that might impair or appear to impair judgment (22 Pa.Code § 235.9(1)), and (b) engaging in a sexual relationship with a student (22 Pa.Code § 235.10(3)). We note that the Commission did not actually find that M.T. violated the gift ban provision in the Code of Conduct. Accordingly, we need not address that issue on appeal. With regard to the sexual conduct violation, however, based upon the factual findings, M.T. clearly violated the prohibition against engaging in a sexual relationship with a student.

### 7. *Sexual Abuse or Exploitation*

 Under the Act, "[a] finding of guilt by the [C]ommission for sexual abuse or exploitation" will bar the Commission from ever lifting the suspension of a certificate of a professional educator or reinstating the certificate of a professional educator. Section 16(b)(1) of the Act.[14] Section 1.2 of the Act defines "[s]exual abuse or exploitation" as follows:

> [T]he employment, use, persuasion, inducement, enticement or coercion of a child or student to engage in or assist any other person to engage in any sexually explicit conduct or a simulation of any sexually explicit conduct for the purpose of producing a visual depiction . . . or filming, of any sexually explicit con-

**14.** Added by Act of December 14, 1989, P.L. 612, *as amended,* 24 P.S. § 2070.16(b)(1).

duct or conduct that constitutes an offense under 18 Pa.C.S. Ch. 31 ... or section 6312 ... or other forms of sexual exploitation of children or students.

*Id.* § 2070.1b.

M.T.'s only challenge to the Commission's conclusion that he engaged in sexual abuse or exploitation is that he did not engage in the activities with Student described in the factual findings. He does not argue that the conduct as described by the findings does not meet the Act's definition of "[s]exual abuse or exploitation." Because we have rejected all of M.T.'s challenges to the Commission's and Hearing Officer's factual findings, we reject M.T.'s challenge to the Commission's conclusion that the conduct constituted sexual abuse and exploitation under the Act.

### 8. *Danger to Health, Safety, and Welfare of Students*

■ M.T. challenges the Commission's decision to sustain the Department's exception to the Hearing Officer's conclusion that M.T. did not present an immediate threat to the health, safety, or welfare of other students or person in Commonwealth schools. The effect of the Commission's decision was to make the order revoking M.T.'s teaching certificate effective immediately.[15]

In considering the Department's exception, the Commission noted that, when a stay is operational, nothing prevents an educational professional upon whom the Commission has imposed a revocation order from continuing to teach or seeking employment as a teacher during the appeal period. In such a case, if the Commission perceives that an educational professional poses a danger to students or other persons in a Commonwealth school, the ability to recognize and guard against the *potential* threat of such a teacher to students provides a means to ensure the health, safety, or welfare of students and others in the schools.

The Commission considered several factors in concluding that M.T. presented a potential threat to the health, safety, or welfare of students in the Commonwealth schools: (1) his predatory conduct toward Student over the course of three years, (2) his refusal to discontinue his communications with Student at the direction of his supervisor after Student graduated, and (3) his concealment of his relationship with Student while she was in high school and after her graduation. The Commission apparently agreed with the Department's position that M.T.'s "calculated and conscious actions" pose "a threat that could continue unabated should discipline not be imposed immediately." (Commission Adjudication at 9.)

M.T. claims that the Commission erred. He argues that (1) the District did not instruct him to discontinue contact with Student until after she graduated, and (2) the Commission's findings regarding sexual activity between M.T. and Student are erroneous.

The difficulty in this case is that, although M.T. clearly engaged in predatory conduct with regard to Student, there is no indication that he engaged in similar conduct with other students. While the record evidence makes apparent that M.T. had become obsessed with Student, there is no clear indication that he would trans-

---

15. Section 15(b) of the Act provides that

An appeal filed under subsection (a) shall operate as a stay of the discipline until the determination of the appeal, except where the commission's decision to discipline is accompanied by a finding that immediate discipline is necessary to protect the health, safety or welfare of students or other persons in the schools of this Commonwealth. 24 P.S. § 2070.15(b).

fer his attention in a similar manner to other students during the period of his pending appeal. Based upon the focused nature of M.T.'s conduct—that is, the fact that he persisted in his improper conduct over such a long period of time, but limited that improper conduct to a single student—our essential inquiry must be whether the Commission could properly base its finding of a threat on evidence of past behavior targeted toward a particular student.

We believe that in assessing the threat to other students in this type of situation, it is appropriate for the Commission to weigh the nature and extent of the teacher's conduct against the fact that the teacher confined his conduct to a particular student. If the conduct that occurred is egregious enough, the fact that the actor limited the conduct to a single student should not prevent the Commission from imposing immediate discipline. Under such circumstances, it would be reasonable for the Department to seek to ensure that such outrageous conduct does not recur, and the Commission would be acting within its authority to impose immediate discipline to avert that threat.

Applying this standard, we believe that the facts in the record support the Commission's findings and conclusion that immediate discipline was warranted. Although there is no indication that M.T. is or has engaged in improper conduct with any other student, the extreme, egregious, and deplorable nature of M.T.'s conduct with Student provides a meaningful basis for a determination that immediate discipline is necessary in order to prevent a recurrence of M.T.'s conduct with another student.

### E. Remaining Challenges

M.T. raises several other arguments: (1) that the Commission erred and violated M.T.'s rights by failing to include in the certified record a transcript of oral argument before the Commission; (2) that laches bars the Commission's action; (3) that the Commission failed to issue a decision within the time requirements of the Act; and (4) that the proceedings violated his due process and equal protection rights. We reject these arguments because M.T. has failed to adequately brief them. Pa. R.A.P. 2119; see City of Philadelphia v. Berman, 863 A.2d 156, 161 (Pa. Cmwlth.2004) (holding that party's failure to develop issue in argument section constitutes waiver of issue).

But even if he had preserved those issues for review, they are without merit. With regard to the first issue, there is no requirement in the Act or elsewhere that oral arguments be transcribed and memorialized in the certified record. As to the second issue, the Department did not become aware of the misconduct until shortly before it brought its charges against M.T. We do not discern any material and inexplicable delay in the Commission's actions in this case. With regard to the third issue, as the Department notes, Section 14 of the Act, 24 P.S. § 2070.14(c), is directory only, and the Commission is not under a duty to issue a decision within forty-five days of its receipt of a Hearing Officer's recommended decision. Gow, 763 A.2d at 533.

### CONCLUSION

For the reasons set forth above, we affirm the bulk of the Commission's adjudication and amended order in this matter. We reverse only the Commission's conclusion that M.T. was guilty of incompetence and cruelty. Whether the remaining charges, which we affirm, support the discipline the Commission imposed on M.T. in the absence of the charges of incompetency and cruelty is a question that the Com-

mission must answer in the first instance. Accordingly, we will affirm the adjudication and amended order in part and remand this matter to the Commission to reconsider the discipline imposed on M.T. in light of our decision.

### ORDER

AND NOW, this 5th day of August, 2010, the order of the Pennsylvania Professional Standards and Practices Commission (Commission) is AFFIRMED in part. We REVERSE only the Commission's conclusions that M.T.'s conduct constituted incompetence and cruelty, and we REMAND the matter to the Commission to consider whether, in light of our decision, it wishes to reconsider the discipline it has imposed.

Because the Court intends to publish this opinion should "proceedings after appeal result in discipline," such that the confidentiality requirements of Section 10 of the Professional Educator Discipline Act (the Act)[16] become inapplicable, the Department of Education, after the matter has been completed and all available appeal rights have been exhausted, is directed to inform this Court as to whether discipline has been imposed such that the opinion may be published in accordance with Section 10 of the Act.

Jurisdiction is relinquished.

---

**16.** Act of December 12, 1973, P.L. 397, added by Act of December 20, 2000, P.L. 918, 24 P.S. § 2070.11(a), imposes confidentiality and provides, in part, as follows:

*All information relating to any complaints,* including the identity of the complainant, *or any proceedings* relating to or resulting from such complaints, *shall remain confidential,* unless or until discipline, other than a private reprimand, is ordered.... *Should proceedings, after all appeals, result in discipline,* other than private reprimand, *such discipline and all records pertaining thereto shall become public.*

(Emphasis added.)