# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

JoeAnna McClain, d/b/a, Nana's    :
Daycare and JoeAnna McClain,    :
individually and Nana's Daycare,    :
LLC,    :
                   Petitioners    :
   :
          v.    :   No. 1656 C.D. 2017
   :   Argued: November 15, 2018
Pennsylvania Department of    :
Education, Division of Food and    :
Nutrition,    :
                  Respondent    :

BEFORE:    **HONORABLE RENÉE COHN JUBELIRER,** Judge
              **HONORABLE ANNE E. COVEY,** Judge (P.)
              **HONORABLE CHRISTINE FIZZANO CANNON,** Judge

<u>**OPINION NOT REPORTED**</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**          **FILED: January 3, 2019**

JoeAnna McClain, d/b/a, Nana's Daycare, JoeAnna McClain, individually (McClain), and Nana's Daycare, LLC (Daycare) (collectively, Petitioners), petition for review of the September 18, 2017 Determination and Order (Determination) of a Hearing Examiner dismissing Petitioners' appeal. By dismissing the appeal, the Hearing Examiner allowed the Pennsylvania Department of Education's Division of Food and Nutrition (together, Department) to proceed with its August 19, 2015 Notice of Proposed Termination and Disqualification (Termination Notice) to

individually disqualify McClain and terminate Daycare's current and future participation in the Child and Adult Care Food Program (Program). The Department, after review and audits, determined that Daycare did not maintain documentation for the eligible meals it served and claimed for Program reimbursement each month, as required by federal regulations. Because of this, the Department issued its Termination Notice and demanded repayment of $504,758.56, the amount it alleges was overpaid to Daycare in Program funds. Before this Court, Petitioners challenge the factual findings and legal conclusions made by the Hearing Examiner. Because the factual findings are supported by substantial evidence, and the legal conclusions are not in error, we affirm.

## I. Program Background

In order to understand the present case, it is helpful to review the relevant portions of the detailed regulatory scheme governing the Program. The Program, funded by the Food and Nutrition Services Department (FNS) of the United States Department of Agriculture (USDA), was created pursuant to the Richard B. Russell National School Lunch Act. 42 U.S.C. §§ 1751 – 1769j; 7 C.F.R. § 226.1. The Program "provide[s] aid to child and adult participants and family or group day care homes for provision of nutritious foods that contribute to the wellness, healthy growth, and development of [its participants]." 7 C.F.R. § 226.1. The USDA makes funds available yearly to state agencies, which administer the Program, to reimburse participating institutions,[1] such as daycares, "for their costs in connection with food service operations." 7 C.F.R. §§ 226.1, 226.3, 226.4(a). In addition, the state

---

[1] The Program regulations define "[i]nstitution" to include "a . . . child care center . . . which enters into an agreement with the State agency to assume final administrative and financial responsibility for Program operations." 7 C.F.R. § 226.2.

agencies monitor and assist institutions within the Program. 7 C.F.R. § 226.6(a). Through its Division of Food and Nutrition, the Department administers the Program in Pennsylvania.

As part of Program requirements, the Department is required to conduct administrative reviews of participating institutions every three years. 7 C.F.R. § 226.6(i)(5). An administrative review is an off-site or on-site evaluation to review "both critical and general areas" of an institution's performance over the course of one month. 7 C.F.R. § 210.18(b), (c). The Department may also request the Pennsylvania Office of the Budget, Bureau of Audits (Budget Office), to perform more extensive audits on participating institutions to determine Program compliance. 7 C.F.R. § 226.6(i)(5).[2] In both administrative reviews and audits, the Department or the Budget Office reviews the documentation institutions must maintain and verify that the institution's monthly reimbursement claims are accurate. Claims are "not properly payable if an institution does not comply with recordkeeping requirements." 7 C.F.R. §§ 226.14(a), 226.15(e).

If the Department learns through an administrative review or audit that an institution is in violation of regulatory requirements, recordkeeping or otherwise, it shall require the institution to submit a corrective action plan (CAP) which, when implemented, would correct the institution's specific violations. 7 C.F.R. § 210.18(j). The Department also must provide assistance to the institution to bring it into compliance. 7 C.F.R. § 210.18(*l*)(2)(v)(A). If the Department has provided technical assistance and sought corrective action, but the institution remains

---

[2] Section 226.6(i)(5) states that contracts between the Department and an institution must require the institution to have its books and records pertaining to its food service operations "available for inspection and audit by representatives of the State agency . . . for a period of [three] years from the date of receipt of final payment under the contract." 7 C.F.R. § 226.6(i)(5).

noncompliant, the Department shall take fiscal action[3] to obtain repayment of the overpaid amounts that are unsupported by the documents.  7 C.F.R. §§ 210.18(j), (*l*)(2)(v), 210.19(c).

If regulatory compliance issues persist and the Department finds that an institution has committed one or more "serious deficiencies,"[4] the Department shall issue a notice of serious deficiency advising both the institution and the individuals responsible for the institution[5] of the specific deficiencies and necessary corrective actions.  7 C.F.R. § 226.6(c)(3)(iii)(A).  A notice of serious deficiency also contains a warning to the institution that "failure to fully and permanently correct the serious

---

[3] Fiscal action is part of a state agency's responsibility to "ensur[e] Program integrity" by taking action for claims "that are not properly payable."  7 C.F.R. § 210.19(c).  Fiscal action is defined to include "the recovery of overpayment through direct assessment."  7 C.F.R. § 210.19(c)(1).

[4] A list of serious deficiencies is provided in 7 C.F.R. § 226.6(c)(3)(ii) and includes "[f]ailure to operate the Program in conformance with performance standards," "[f]ailure to perform any of the other financial and administrative responsibilities required by this part," "[f]ailure to maintain adequate records," and "[c]laiming reimbursements for meals not served to participants."

[5] The regulations state that when a proposed termination and disqualification is enforced, it applies not only to the institution but also to the institution's responsible principals and individuals.  7 C.F.R. § 226.6(c)(3)(iii)(E)(1).  "Principal" is defined by the regulations as "any individual who holds a management position within, or is an officer of, an institution or a sponsored center."  7 C.F.R. § 226.2.  A "[r]esponsible principal or responsible individual" is defined as:

> (a) A principal, whether compensated or uncompensated, who the [s]tate agency or FNS determines to be responsible for an institution's serious deficiency;
>
> (b) Any other individual employed by, or under contract with, an institution or sponsored center, who the [s]tate agency or FNS determines to be responsible for an institution's serious deficiency; or
>
> (c) An uncompensated individual who the [s]tate agency or FNS determines to be responsible for an institution's serious deficiency.

*Id.*

4

deficiency(ies) within the allotted time will result in the [s]tate agency's proposed termination of the institution's agreement and the proposed disqualification of the institution and the responsible principals and individuals" of the institution. 7 C.F.R. § 226.6(c)(3)(iii)(A)(5). If "corrective action is not taken to fully and permanently correct the serious deficiency" after a notice of serious deficiency, the state agency shall notify the institution and its responsible principals of the proposed termination of the Program agreement and disqualification of "the institution and the responsible principals and responsible individuals" from future Program participation. 7 C.F.R. § 226.6(c)(3)(iii)(C). Until participation is officially "suspended, the institution may continue to participate" in the Program and receive reimbursement for eligible meals. 7 C.F.R. § 226.6(c)(3)(iii)(C)(5). The Department shall take fiscal action for the funds that were overpaid to the institution as a result of all serious deficiencies leading to the proposed termination. 7 C.F.R. § 226.14. Once the Department issues a notice of proposed termination and disqualification and demand of overpayment, it must hold an administrative review for the institutions, responsible principals, and responsible individuals. 7 C.F.R. § 226.6(k)(2)(iii), (iv), (xi). The determination made by the hearing examiner after the hearing is "the final administrative determination to be afforded the institution and the responsible principals and responsible individuals." 7 C.F.R. § 226.6(k)(5)(x).

## II. The Hearing

In accordance with the above regulatory scheme, the Department issued a Notice of Serious Deficiency in 2015 (2015 Serious Deficiency Notice) and then the Termination Notice on August 19, 2015, which Petitioners appealed on August 31, 2015. (Determination, Findings of Fact (FOF) ¶¶ 79-80.) Due to changes in counsel,

5

scheduling conflicts, and continuances, a hearing was not held until April 24-25, **2017**. (*See* Determination at 1-4.) On April 6, 2017, Petitioners' counsel requested permission to depose a Department auditor as a discovery tool, which the Hearing Examiner denied, reasoning that discovery is not generally permitted in administrative hearings, and the hearing proceeded as scheduled. (Determination at 4; Order Denying Discovery, Reproduced Record (R.R.) at 81a-84a.)[6]

The Department presented three witnesses at the hearing: the Director of Child Nutrition Programs for the Department's Division of Food and Nutrition (DFN Director), and two employees from the Budget Office, the assistant director (Assistant Director) and an audit specialist (Audit Specialist). Petitioners presented the testimony of Daycare's Director (Daycare Director), as well as their own independent accountant (Accountant).

DFN Director testified first on behalf of the Department and recalled that Daycare became a participating institution of the Program in 2010.[7] (FOF ¶ 15; R.R. at 54b.) DFN Director explained that the Department conducted three on-site administrative reviews of Daycare, the first of which occurred in August 2010, shortly after Daycare became a participating institution; the other two occurred in June 2012 and March 2013. During the first administrative review in August 2010, DFN Director testified, the Department found Daycare was not maintaining current enrollment and eligibility paperwork as required. (FOF ¶ 17; R.R. at 58b-59b.) According to DFN Director's testimony, the Department took fiscal action for that month's overpayment in the amount of $2,900 and directed Daycare to submit a

---

[6] Petitioners have produced two volumes of reproduced records. Volume One contains pages 1a through 84a, and volume two contains pages 1b through 303b.

[7] At that time, Daycare had approximately 30 to 50 children enrolled; by the time of the hearing, enrollment had grown to approximately 345 children. (R.R. at 185b.)

CAP, which it did. (FOF ¶¶ 18, 21-22; R.R. at 59b, 61b, 62b-63b.) In the June 2012 administrative review, DFN Director stated the Department found the same problems persisted, reflecting that Daycare had not implemented the 2010 CAP. (FOF ¶ 26.) DFN Director testified that the Department again took fiscal action for that month in the amount of $1,670 and required another CAP, which Daycare provided. (*Id.* ¶¶ 26-27; R.R. at 61b-63b, 85b, 90b-91b.) DFN Director acknowledged that, although the Department provided technical assistance to Daycare after the administrative reviews to correct deficiencies of incomplete or inaccurate documentation, the problems remained. (FOF ¶¶ 31, 37; R.R. at 87b-88b, 98b.) DFN Director stated that during the March 2013 administrative review, the Department found Daycare still had not corrected its compliance errors. (FOF ¶ 28; R.R. at 63b, 85b.) Specifically, DFN Director testified the Department found Daycare was not implementing its CAP procedures and problems existed on a "more extensive level," as children's enrollment forms and applications were missing, meals were claimed for children who did not currently attend Daycare, and meal count errors persisted. (R.R. at 63b, 85b.) DFN Director recalled that the Department took fiscal action for the month of March 2013, this time in the amount of $17,000, and required a CAP, but Daycare did not comply. (FOF ¶ 29; R.R. at 63b, 65b.) As DFN Director explained, Daycare had missing or outdated applications and enrollment forms that did not support Daycare's reimbursement claims, which made it deficient under the Program. When Daycare did not timely submit a CAP, the Department needed to issue a serious deficiency notice. (R.R. at 49b-50b.) Therefore, the Department issued its first notice of serious deficiency, DFN Director testified, at which time Daycare submitted a CAP, and the Department

7

temporarily deferred the serious deficiency as permitted by 7 C.F.R. § 226.6(c)(3)(iii)(B)(1)(i).  (FOF ¶¶ 34, 35.)

The Assistant Director from the Budget Office testified that when the Department found Daycare's recurring deficiencies in administrative reviews, it requested the Budget Office to perform a limited audit of Daycare by reviewing documents from October 1, 2010 through September 30, 2012.  (FOF ¶ 39; R.R. at 12b, 16b, 42b.)  Assistant Director explained that Budget Office auditors followed the same standards and procedures used in administrative reviews and reviewed meal count sheets, enrollment forms, and applications, and if a child's enrollment form or application was missing or incomplete, the meals claimed for that child would be non-reimbursable and added to the overpayment total.  (FOF ¶ 40; R.R. at 9b-12b, 31b-32b.)  According to Assistant Director, the Budget Office completed the limited audit and produced its report on November 8, 2013, which noted the same problems the Department discovered in its administrative reviews, such as incomplete or missing applications and enrollment forms.  (FOF ¶¶ 42, 47; R.R. at 12b.)  Assistant Director explained that when the Department reviewed the Budget Office's limited audit report of November 8, 2013, and recommendation for a full audit, the Department requested the Budget Office to perform a full performance audit (Full Performance Audit) covering three years, from October 1, 2010, through September 30, 2013.  (FOF ¶¶ 14, 49; R.R. at 12b.)  Assistant Director stated that the Full Performance Audit revealed a lack of adequate documentary support for Daycare's meal reimbursement claims for this three-year period, such that

$504,758.56 of the $744,797.17 the Department had paid to Daycare for its claims over the relevant time could not be verified. (FOF ¶¶ 66, 68;[8] R.R. at 9b.)[9]

Audit Specialist, who was present for both the limited audit and Full Performance Audit, also testified. (R.R. at 108b-09b.) Audit Specialist testified that the Full Performance Audit was delayed when a water main break on December 23, 2013, flooded the Daycare facility and temporarily displaced Daycare and its files, but the Budget Office was able to begin its Full Performance Audit in March 2014. (FOF ¶¶ 51, 54-55; R.R. at 123b-24b.) Audit Specialist explained that no documents had been destroyed after the water main break and the Budget Office auditors were able to review all necessary documentation. (R.R. at 123b, 139b.) As noted in the Full Performance Audit Report, Audit Specialist agreed that the Budget Office auditors found missing, incomplete, and inaccurate applications and enrollment forms. (FOF ¶ 47; R.R. at 130b.)

In Petitioners' defense, Daycare Director contested the testimony from the Assistant Director and Audit Specialist about the status of Daycare's documentation and whether it was missing or destroyed. Daycare Director testified she was familiar with the recordkeeping done at Daycare and acknowledged that enrollment forms, applications, and meal count sheets had to be presented for administrative reviews and audits. (R.R. at 143b, 148b.) Contrary to Audit Specialist's testimony, Daycare Director testified that the flooding of the Daycare facility damaged some records and

---

[8] In FOF ¶ 68, the Hearing Examiner identified the amount of overpayment as $506,412.19. Nonetheless, the Full Performance Audit reflected an overpayment amount of $504,758.56, which is also the figure used by the Hearing Examiner in the order. Accordingly, we will use the latter figure of $504,758.56.

[9] According to the Department, the $504,758.56 overpayment assessment did not include the amounts upon which the Department previously took fiscal action following the administrative reviews. (FOF ¶ 64.)

9

contributed to why so many required documents were missing during the Full Performance Audit. (*Id.* at 171b, 196b.)

Daycare also presented the testimony of Accountant, who contested the Department's calculation of the overpayment. Accountant, who was hired by Daycare in November 2016 after the Full Performance Audit and Termination Notice,[10] testified as to her methodology in calculating approximately $50,000 in overpayment, rather than the $504,758.56 alleged by the Department. Accountant stated that she reviewed meal count sheets Daycare provided to her and compared those to the monthly amounts Daycare claimed for reimbursement, but she did not review documents related to children's eligibility or enrollment. (R.R. at 224b, 238b, 260b-67b.) Accountant admitted that while she had never conducted a Program audit, she felt that her review did not require special knowledge of the Program, and she was confident in her calculation. (*Id.* at 244b, 260b, 262b.)

### III. Hearing Examiner's Determination

Based upon the evidence presented, the Hearing Examiner concluded the Department met its burden of showing Daycare received $504,758.56 of overpaid funds and accordingly dismissed Petitioners' appeal. (Determination, Conclusion of Law ¶ 7.) The Hearing Examiner's Determination rested primarily upon her decision not to give any weight to the testimony of Petitioners' witnesses. The Hearing Examiner noted that no request was made to qualify Accountant as an expert; thus she remained a fact witness whose testimony the Hearing Examiner "discounted in its entirety" because Accountant was unfamiliar with Program

---

[10] Accountant testified she was hired as an expert by Daycare for this case and did not serve as Daycare's personal accountant. (R.R. at 221b-22b.)

10

regulations and did not review the proper documentation to make her calculations. (Determination at 29, 31.)

The Hearing Examiner characterized the testimony of Daycare Director as "inconsistent or unclear" which "render[ed] most of her testimony unreliable;" thus she gave it no weight. (*Id.* at 33.) Specifically, the Hearing Examiner found that Daycare Director gave conflicting testimony about Daycare's specific deficiencies found in administrative reviews, her knowledge of the obligation to reimburse overpaid claims, and Daycare's overall recordkeeping. The Hearing Examiner found that Daycare Director's testimony did not contradict the findings of the Full Performance Audit report and, to the extent it was consistent with the report, confirmed only that Daycare "failed to maintain adequate documentary support" for its claims during the relevant period. (*Id.* at 37.)

Although the Hearing Examiner made no specific determinations about the credibility of the Department's witnesses, she credited that testimony by implication through her reliance on that testimony and specifically finding that the testimony from Petitioners' witnesses should not be given weight. The Hearing Examiner relied upon the testimony provided by the Department to establish that Daycare had repeat deficiencies over the years, which resulted in Daycare receiving "unsupported reimbursements." (*Id.* at 27-29.)

Before the Hearing Examiner, Petitioners argued the Department was barred by the doctrines of laches and estoppel from recovering the overpayment. Petitioners urged the Hearing Examiner to find that the Department did not prove Daycare ever received Program funds for which it did not account. Further, consistent with Accountant's testimony, Petitioners maintained that if Daycare received any funds unsupported by its documentation, the total overpayment amount

11

was substantially less than $504,758.56. (Petitioners' Post-Hearing Brief, Certified Record (C.R.) Item No. 4, at 6-8.) The Hearing Examiner rejected Petitioners' arguments that the Department was barred by laches and estoppel. Finding that the Department did not act with delay between the time of the Full Performance Audit and the Notice of Serious Deficiency, the Hearing Examiner determined laches did not apply. The Hearing Examiner also reasoned that there was no misrepresentation because Daycare, as a Program institution, was on notice of the regulatory procedures and its obligation to conform with those procedures; thus Petitioners' estoppel argument did not succeed.

Additionally, the Hearing Examiner rejected Petitioners' assertion that the Department did not prove Daycare had received funds for which it did not account. Primarily, the Hearing Examiner found the issue to be waived, as it was not raised until the post-hearing brief. However, Hearing Examiner additionally determined that the argument was not supported by the record, which included the Department witnesses' uncontradicted testimony that the Department had paid the funds to Daycare. The Hearing Examiner found that Petitioners "ha[d] not provided any competent or reliable evidence that would contradict or challenge [the Department's] evidence," and the Department was required to take fiscal action to recover the unsupported claims under 7 C.F.R. § 226.14. (Determination at 49.) Therefore, the Hearing Examiner dismissed the appeal and allowed the Department to proceed with its termination of Daycare's Program agreement, disqualification of Daycare and the responsible principals, McClain and Daycare Director, from future Program participation, and fiscal action to recover the $504,758.56 in Program funds paid to Daycare that were unsupported by the records. (*Id.* at 51.)

12

## IV.    Arguments on Appeal

On appeal,[11] Petitioners raise six issues for our consideration.  Petitioners assert the Department is barred first, by the doctrine of laches and, second, by the doctrine of estoppel from taking fiscal action for any overpaid meals in the three-year period at issue.  Third, in Petitioners' view, the Department did not prove by substantial evidence that Daycare received funds for which it did not account.  Fourth, Petitioners claim that, at most, the overpayment amount was $49,562, as testified to by their expert witness Accountant.  Fifth, Petitioners contend the Hearing Examiner deprived them of due process when she denied the request to depose the Department's auditor, because Section 35.112 of the General Rules of Administrative Practice and Procedure (GRAPP) provides that discovery may be properly considered at a prehearing conference, *see* 1 Pa. Code § 35.112.  Sixth and last, Petitioners assert the Department provided no evidence that McClain and Daycare were "one and the same," and thus her proposed individual disqualification should be dismissed.  (Petitioners' Brief (Br.) at 63-64.)

The Department responds that the defenses of laches and estoppel are not supported by evidence, citing its multiple administrative reviews and regulatory requirements to show due diligence and notice to Daycare of its deficiencies.  Additionally, the Department contends that Petitioners have waived the argument that there was insufficient evidence Daycare received funds for which it did not account by not raising that argument at the hearing.  Emphasizing the conclusive nature of the Hearing Examiner's determinations of evidentiary weight, the

---

[11] Our "review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether necessary findings of fact are supported by substantial evidence." *William Penn Sch. Dist. v. Dep't of Educ., Div. of Food & Nutrition*, 902 A.2d 583, 586 n.3 (Pa. Cmwlth. 2006).

13

Department urges this Court to affirm the Hearing Examiner's conclusion that Daycare received $504,758.56 in Program funds that were not properly payable to it. Additionally, the Department argues there was no violation of due process in denying Daycare's discovery request because, while GRAPP may allow for discovery, it is not mandatory. Last, the Department asserts that Petitioners' contention that McClain cannot be individually disqualified is waived because Petitioners did not raise it during the hearing.

### V. Analysis

*1. Whether the Department is barred by laches from seeking reimbursement for the overpayment.*

Petitioners contend that the Department is barred by laches, as it acted with delay in pursuing its proposed termination of Daycare. The doctrine of laches "bar[s] relief when the complaining party has not been diligent in instituting his or her action to the prejudice of another." *United Bhd. of Carpenters & Joiners of Am., Local 261 v. Pa. Human Relations Comm'n*, 693 A.2d 1379, 1382 (Pa. Cmwlth. 1997). The mere passage of time is not enough to impute laches; rather, the party asserting the defense must show harm resulting from the delay. *Harrington v. Dep't of State*, 427 A.2d 719, 721 (Pa. Cmwlth. 1981). A finding of laches is a factual determination made "by examining the circumstances of each case." *United Bhd. of Carpenters*, 693 A.2d at 1383.

Petitioners argue that the Department acted with delay by not issuing its 2015 Serious Deficiency Notice until well after the first administrative review in August 2010. According to Petitioners, the Department prejudiced Daycare by allowing it to "accrue[] a crushing amount of debt" over five years before the Department addressed the problem. (Petitioners' Br. at 40.) However, we agree with the Hearing

14

Examiner's conclusion that the Department did not act with delay in notifying and taking action for Daycare's deficiencies nor was Daycare harmed by any delay. The Department conducted three administrative reviews over the course of three years and, in accordance with the Program's regulatory requirements, took fiscal action for the noncompliance it found in each of those reviews. Additionally, the Department communicated to Daycare the specific deficiencies it discovered and required CAPs targeting those deficiencies. Nonetheless, the Department found in each successive administrative review that Daycare did not comply with its submitted CAPs to bring its recordkeeping into compliance with the Program.

Between the first administrative review in 2010 and the 2015 Serious Deficiency Notice, the Department gave Daycare at least three different opportunities to bring its recordkeeping into compliance with the regulations. In fact, we note that when Daycare untimely submitted a CAP after the March 2013 administrative review, the Department deferred a serious deficiency notice, which allowed Daycare one more opportunity to correct its procedures. Because of these repeated deficiencies, the Department resorted to requests for a limited audit and, finally, the Full Performance Audit. It was after the conclusion of three administrative reviews, one limited audit, and one full performance audit, all showing the same persistent deficiencies over a three-year period, that the Department proceeded, all of which is in accordance with the process set forth in the regulations for proposed termination. *See* 7 C.F.R. § 226.6(c)(3)(iii)(C). The Department did not unduly delay in taking action, but acted timely at each stage of the process through its reviews and audits. Further, while the Budget Office's Full Performance Audit was delayed, this indisputably resulted from the water main break, which was not the fault of either party. After receiving the Budget Office's

15

Full Performance Audit report in May 2015, the Department issued its 2015 Notice of Serious Deficiency in July 2015, which does not reflect a delay that would cause Daycare prejudice. Finally, in the last step of the process, the Department promptly issued the Termination Notice when Daycare did not respond to the 2015 Serious Deficiency Notice.[12] (FOF ¶¶ 77, 79.)

The goal of the Program is to provide nutrition to those who need and qualify for it. The regulations promote this by providing multiple opportunities for review and assistance to participating institutions, like Daycare. Rather than terminating an institution when an error is made, the regulations require a process to bring the participating institution into compliance. The regulatory scheme recognizes that compliance errors can occur and gives institutions time to correct those errors before initiating termination actions. The Department followed the required process for remedying noncompliance, in which CAPs are required, assistance is provided, and administrative reviews are utilized before the Department resorts to full performance audits and notices of serious deficiency. We do not find this to constitute undue delay. Moreover, Daycare has not shown that it was prejudiced by the lapse of time while the Department followed its process in an attempt to bring Daycare into compliance. Petitioners argue Daycare was prejudiced because the Department allowed Daycare to accrue over $500,000 of overpayment before issuing the Termination Notice. However, as previously explained, the Department kept Daycare advised of its repeated deficiencies from 2010 to 2015, provided Daycare

---

[12] Although it does not alter our analysis or conclusion that the Department did not act with delay in pursuing its action, we note the significant lapse of time between the issuance of the Termination Notice and the hearing. During those nearly two years, Petitioners continually sought extensions and even obtained new counsel just weeks before the first scheduled hearing date in September 2016. To the extent any delay existed between the Termination Notice and the Determination, it cannot be attributed to the Department. (*See* Determination at 2-4.)

assistance, and sought corrective action to prevent future deficiencies. Daycare was on notice of its recordkeeping deficiencies and obligation to repay unsupported funds; therefore, it was not prejudiced by accrual of overpayment during the five-year period in which the Department sought to correct Daycare's noncompliance. Because the Department did not act with delay and Petitioners were not prejudiced, the Hearing Examiner properly rejected the laches argument.

2. *Whether the Department is barred by estoppel from seeking reimbursement for the overpayment.*

Petitioners contend that the Department made various misrepresentations to Daycare and is now barred by the doctrine of estoppel from proceeding on its fiscal action and Termination Notice. "[E]stoppel recognizes that an informal promise . . . which leads another to rely justifiably thereon to [their] own injury or detriment[] may be enforced." *Foster v. Westmoreland Cas. Co.*, 604 A.2d 1131, 1134 (Pa. Cmwlth. 1992) (quoting *Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 503 (Pa. 1983)). In order to assert "the doctrine of equitable estoppel [against] a Commonwealth agency," the following must be shown:

> the party to be estopped (1) must have intentionally or negligently misrepresented some material facts; (2) knowing or having reason to know that the other party would justifiably rely on the misrepresentation; and (3) induced the party to act to his or her detriment because of a justifiable reliance upon the misrepresented facts.

*Id.* According to Petitioners, the Department made misrepresentations to Daycare by providing assistance to correct deficiencies and renewing its Program agreement. Petitioners also assert the Department repeatedly represented that Daycare was in good standing with the Program, even specially recognizing Daycare for its success

17

in meeting certain requirements by issuing it a Letter of Satisfactory Action in 2012 and a Certificate of Achievement in March 2016. Petitioners cite these actions, along with the Department's approval of Daycare's submitted CAPs, as misrepresentations of Daycare's Program compliance for many years. (Petitioners' Br. at 37-38.)

We agree with the Hearing Examiner that Petitioners' estoppel argument does not meet the test set forth in *Foster* and *Novelty Knitting*. The Department kept Daycare informed of its deficiencies beginning with the first administrative review in 2010 through to the 2015 Notice of Serious Deficiency. The Department's assistance was not a misrepresentation, but part of its regulatory obligation to provide assistance to institutions and seek corrective action before resorting to fiscal actions and, eventually, notices of serious deficiency and proposed termination notices. 7 C.F.R. § 210.18(*l*)(2)(v). Petitioners are incorrect that the approval of a CAP or continued renewal of an agreement with an institution constitutes a misrepresentation. CAPs are action plans that, if followed, are intended to correct noncompliance so that identified deficiencies will not occur in the future. The Department's approval of them, however, is not a representation that the institution's future noncompliance will be excused if the institution does not comply with its CAP. *See* 7 C.F.R. § 226.6(c)(3)(iii)(A)(5) (specifying that notices of serious deficiency must inform institutions "[t]hat failure to fully and permanently correct" the deficiencies in the required time will result in disqualification and termination).

Furthermore, Petitioners mischaracterize the Department's 2012 Letter of Satisfactory Action as a representation of good standing. The letter cited by Petitioners confirms the procedures of the July 2012 administrative review and notifies McClain that the CAP submitted in response to that administrative review was received. (R.R. at 45a.) This letter merely informs McClain that if Daycare

18

follows the steps in its CAP, it will correct the specific deficiencies found in the administrative review. It does not represent that Daycare had fully and permanently corrected its deficiencies. To the contrary, it even reiterates that the Department will take fiscal action for the deficiencies found in that administrative review.

The Certificate of Achievement cited by Petitioners is also incorrectly represented, as that document indicates only that Daycare Director completed a course in Program Performance Standards. Moreover, Daycare Director herself testified that this Certificate of Achievement related to training that was required as a part of corrective action for Daycare's deficiencies. (*Id.* at 49a, 144b-45b.) Again, this document does not stand for the proposition that the Department misrepresented anything to Daycare. If anything, it is further evidence that Daycare was on notice of its deficiencies for many years.

We also reject Petitioners' argument that the Department's continued renewal of Daycare's Program agreement is a misrepresentation. Program regulations state that after a proposed disqualification is issued, "the institution may continue to participate and receive Program reimbursement for eligible meals served and allowable administrative costs incurred until [the] administrative review is completed" "unless participation has been suspended." 7 C.F.R. § 226.6(c)(3)(iii)(C)(5). Thus, the fact that the Department continued to allow Daycare to participate in the Program and receive reimbursements until Daycare's termination was finalized is not a representation of compliance. This is particularly true in light of the administrative reviews, audits, and notices informing Daycare otherwise.

Finally, we note that Daycare, as a Program institution, should have been aware of its obligations under Program regulations and the potential termination of

19

its Program agreement if those obligations were not met. *See Quinn v. Dep't of State, Bureau of Prof'l & Occupational Affairs*, 650 A.2d 1182, 1185 (Pa. Cmwlth. 1994) (acknowledging that a regulated entity is "charged with knowledge of the applicable regulations and . . . [cannot] establish reasonable reliance upon [an agency's alleged] misrepresentation"). Therefore, Petitioners can establish neither a misrepresentation nor reliance on that alleged misrepresentation. The record shows that the Department acted in accordance with its duties under Program regulations and made no misrepresentations to Daycare regarding its compliance.

3. *Whether there is substantial evidence to support the findings that Daycare received Program funds for which it did not account.*

Petitioners contend that the Department did not prove Daycare received funds that were unsupported by its documentation. (Petitioners' Br. at 53-54.) In the Determination, the Hearing Examiner characterized this issue as Petitioners asserting "that [Daycare] never had received any of the funds that [the Department] seeks to reclaim here," and found the argument waived. (Decision at 46.) However, Petitioners' argument before the Hearing Examiner and before this Court more specifically goes to whether there is substantial evidence to support a finding that Daycare received Program funds, which were unsupported by the required documentation.

Hearing examiners, as fact finders,[13] are "the sole arbiter[s] of credibility," with "the responsibility to resolve conflicts in testimony arising from inconsistencies," and this Court is bound by those determinations. *M.T. v. Dep't of Educ.*, 56 A.3d 1, 7 (Pa. Cmwlth. 2010). Further, matters of "evidentiary weight are

---

[13] Under Program regulations, "[t]he determination made by [an] administrative review official is the final administrative decision to be afforded the institution and the responsible principals and responsible individuals." 7 C.F.R. § 226.6(k)(5)(x).

properly within the exclusive discretion of the fact finding agency," *Thorpe v. Public School Employees' Retirement Board*, 879 A.2d 341, 348 (Pa. Cmwlth. 2005) (internal quotation omitted), and we do not review them so long as the determination is supported by substantial evidence, *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703, 706 (Pa. Cmwlth. 1995). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *William Penn Sch. Dist. v. Dep't of Educ., Div. of Food & Nutrition*, 902 A.2d 583, 586 n.3 (Pa. Cmwlth. 2006). In determining whether substantial evidence exists, "it is irrelevant that the record reveals evidence that would support a contrary finding;" instead our inquiry is only whether the record has "substantial evidence **supporting the actual findings that were made**." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 143-44 (Pa. Cmwlth. 2004) (emphasis added).

Petitioners argue that the Department's witnesses lacked personal knowledge of the documents upon which the audits were based, and therefore their testimony should be stricken. (Petitioners' Br. at 53.) Further, Petitioners portray the testimony from the Department's witnesses as showing only an "obsession with paperwork and forms without regard as to whether that paperwork and those forms actually reflect the situation on the ground at . . . [Daycare]." (*Id.* at 54.) Because the Department's witnesses focused only upon whether certain documents were present at the time of the Full Performance Audit and not "what monies actually flowed in and out of [Daycare]," Petitioners argue that there is not substantial evidence to support finding Daycare's receipt of unaccounted funds. (*Id.* at 52, 57.) Finally, Petitioners note that any of Daycare's deficiencies arising from missing documentation should be attributed to the water main break at the facility in 2013

and not considered a reflection of what eligible meals were actually served and claimed at Daycare. (*Id.* at 56-57.)

We conclude that there is substantial evidence to support a finding that Daycare received funds which its documentation did not support. While Petitioners are correct that two Department witnesses did not have personal knowledge of the documents that were reviewed during the Full Performance Audit, the Department also presented Audit Specialist, who was on the team that personally performed the audits. (R.R. at 108b-09b.) Audit Specialist testified that he reviewed every document that was made available to the Budget Office auditors and none of those records were irreparably damaged after the water main break. (*Id.* at 123b, 139b.) According to the Audit Specialist, the Budget Office auditors found there were missing enrollment and application forms that Daycare was required to have pursuant to the regulations, which resulted in unsubstantiated meal claims. (*Id.* at 130b, 135b-36b.) Audit Specialist stated that at the end of the auditors' visits for the limited audit and Full Performance Audit, they would provide Daycare with a list of missing items to allow Daycare the opportunity to look for and produce those documents. (*Id.* at 128b.) As DFN Director testified, although Daycare could not backdate missing records, it could have notified the Department of any missing records and obtained replacements for them, which would be considered effective as of the replacement date. (*Id.* at 279b-80b.) However, Daycare did not do that. Audit Specialist's testimony is substantial evidence to support a finding that Daycare did not have the documentation it needed to support its claims and, therefore, received funds that its documentation did not support.

The evidence Petitioners presented to contest this was Daycare Director's testimony that the documents were destroyed after the water main break, which the

Hearing Examiner discredited and did not give any evidentiary weight. This decision to discredit Daycare Director's testimony was supported by the record, particularly Daycare Director's inconsistent and unreliable account of Daycare's deficiencies and recordkeeping procedures. (Determination at 33, 35.) For example, Daycare Director testified first that she understood Daycare would need to reimburse the Department if records were not properly kept. (R.R. at 158b.) Shortly thereafter, she testified to the contrary, stating she was unaware of that obligation. (*Id.* at 184b, 195b.) Additionally, while Daycare Director testified at one point that required documents were missing due to the flood from the water main break, she later testified that not all missing documents could be attributed to that incident. (*Id.* at 184b, 195b-96b.) The Hearing Examiner's credibility determination about Daycare Director is supported by the record and binding.

Moreover, to the extent that the rest of Petitioners' argument for this issue relies upon a contention that the documents reviewed by the Budget Office did not reflect what meals it actually served, it ignores the purpose of Program's regulatory requirements. We recognize Daycare believes it distributed meals to enrolled and eligible students and is frustrated that the documentation reviewed by the Budget Office was found to be noncompliant. However, audits are retrospective by nature, and the maintenance of required documentation is the only mechanism by which the Department can verify the accuracy of the claims after the distribution of funds. Because the Department cannot be present at institutions to ensure only enrolled and eligible children receive the meals that will be claimed, it is incumbent upon institutions, such as Daycare, to meticulously maintain its records in accordance with federal regulations. In the absence of such records, the Department has no other

23

option under the regulations than to determine that the institution cannot support the claim.

4. *Whether the amount of Program fund overpayment was $504,758.56.*

Petitioners argue that even if Program funds were overpaid, the total overpayment is merely $49,562 and not $504,758.56. This argument essentially contests the Hearing Examiner's evidentiary weight and credibility determinations. As discussed above, we are bound by a hearing examiner's conclusive determinations about credibility and evidentiary weight. *M.T.*, 56 A.3d at 7; *Thorpe*, 879 A.2d at 348. Further, we inquire only into whether there is substantial evidence to support a hearing examiner's actual findings, not whether the evidence presented would support a contrary finding. *Williams*, 862 A.2d at 143. Petitioners urge us to find that Accountant provided expert testimony correctly establishing approximately $50,000 of overpayment. This would require us to credit and reweigh the testimony of Daycare's witness and the testimony of the Department's witnesses, which we cannot do.

The Hearing Examiner did not give evidentiary weight to the testimony from Daycare's witnesses and provided a detailed explanation for that decision, which is supported by the record. (Determination 29-37.) The hearing transcript supports the Hearing Examiner's explanation that Accountant was unfamiliar with Program requirements and did not conduct her audit in a manner consistent with those requirements. (*Id.* at 30-31; R.R. at 260b-62b.) Accountant, who was previously an auditor for the City of Philadelphia, had never conducted a Program audit, although she testified she did some online research about the Program and meal count claims prior to reviewing the documents. (R.R. at 217b, 264b.) Accountant admitted that

24

she was not familiar with the Program regulations and audits; nor was she knowledgeable about food or nutrition programs. (*Id.* at 260b, 262b.) Accountant stated that based upon her independent review of meal count sheets and Daycare's reimbursement claims, she could not determine which meals the Department found unsupported nor how the Department reached its overpayment figure. (*Id.* at 231b-32b, 240b-43b.) However, because Accountant also admitted she did not consider **any** enrollment or application forms during the course of her review, which were essential to determining Daycare's compliance, it is evident that her calculation did not conform with Program regulations. (*Id.* at 221b, 260b-62b.) Thus, while Accountant was confident that none of the forms provided to her for review were missing or inadequate, this is undermined by her testimony that she did not review all the documents required by the regulations, as the Budget Office auditors had. (*Id.* at 244b.)

Despite Petitioners' attempt to have us do so, we cannot reweigh Accountant's testimony about her independent calculation of the overpayment, which differed from that of the Department. There is substantial evidence in the form of the testimony of the Department's witnesses to support the finding that the overpayment amount was $504,758.56. As previously explained, the testimony from the Department witnesses established that the Budget Office auditors reviewed all necessary documents, which revealed missing and incomplete enrollment and eligibility forms that did not support all of the meals claimed during the relevant time. (*Id.* at 135b-36b.) Further, the Full Performance Audit report, admitted as an exhibit by the Hearing Examiner, details the difference between meals claimed and meals verified by the documentation and supports the determination that the Department paid to Daycare $504,758.56 for meals that lacked documentation and,

therefore, could not be claimed. (*See* Transcript of Hearing with Exhibits, C.R. Item No. 7, Department Ex. 1.) Considering the evidentiary weight determination made by the Hearing Examiner and our review of the evidence, there is substantial evidence to support the Hearing Examiner's finding that Daycare over-claimed $504,758.56 for which the Department must seek reimbursement. *See Williams*, 862 A.2d at 144.

5. *Whether Daycare was denied due process when it was not permitted to depose the Department's auditor as a discovery tool.*

Petitioners contend that the Hearing Examiner deprived them of due process by not granting their request to depose one of the Department's auditors prior to the administrative hearing. "[A]dministrative hearings do not authorize discovery," but Section 35.112 of GRAPP, 1 Pa. Code § 35.112, does allow parties to request the use of discovery in pretrial hearings in order to expedite the proceeding. *UGI Utils., Inc. v. Unemployment Comp. Bd. of Review*, 851 A.2d 240, 251-52 (Pa. Cmwlth. 2004). Nonetheless, "discovery matters are within a [hearing examiner's] discretion," and we have held that GRAPP's provisions "sufficiently provide notice, and permit review of any evidence an agency will introduce at hearing. Thus, they comport with the general principles of due process." *KC Equities v. Dep't of Pub. Welfare*, 95 A.3d 918, 933 (Pa. Cmwlth. 2014).

Petitioners cite to Section 35.112 of GRAPP and argue that its plain language allows for depositions. Section 35.112(5) of GRAPP specifically provides: "[a]t a prehearing or other conference which may be held to expedite the orderly conduct and disposition of a hearing, there may be considered . . . the possibility of the following: . . . (5) [t]he discovery or production of data." 1 Pa. Code § 35.112(5). In the "Order Denying Appellant's Request to Take Deposition," the Hearing

Examiner acknowledged Section 35.112, as well as the general rule precluding discovery in administrative proceedings. (R.R. at 81a-82a.) The Hearing Examiner interpreted Section 35.112 and various other GRAPP provisions, finding that depositions are generally disallowed in administrative hearings unless they are used in lieu of live testimony. (*Id.* at 83a-84a.) *See also* Sections 35.145 and 35.151 of GRAPP, 1 Pa. Code §§ 35.145 (allowing deposition of a witness prior to an administrative hearing), 35.151 (relating to the use of a deposition as part of the record in an administrative hearing).

While it is true that depositions **may** be allowed in the circumstances contemplated under Section 35.112, that section **does not entitle a party to an absolute right to discovery** in administrative hearings. The Hearing Examiner did not deprive Daycare of due process in denying its request to depose the Department's auditor as a discovery tool because Daycare did not have a right to such discovery in this administrative proceeding. *See KC Equities*, 95 A.3d at 933 (finding no violation of due process rights based on an administrative agency's decision not to compel discovery because the regulated entity did not have a right to discovery in such proceedings).

> 6. *Whether the Termination Notice and individual disqualification against McClain is proper.*

Last, Petitioners assert that the Department did not prove that McClain is one and the same with Daycare such that she can be individually disqualified under the Termination Notice. Petitioners did not raise the issue of McClain's individual disqualification at any time before the Hearing Examiner but raise it for the first time on appeal to this Court. Section 703(a) of the Administrative Agency Law, 2 Pa. C.S. § 703(a), states that "[a] party who proceeded before a Commonwealth agency

27

under the terms of a particular statute . . . may not raise upon appeal any other question not raised before the agency." *See also M.T.*, 56 A.3d at 10 n.12. Petitioners did not raise the issue before the Hearing Examiner; therefore, we find the issue waived.

However, even if the issue was properly before us, we would not accept Petitioners' argument. Program regulations provide that when a hearing examiner upholds a proposed termination and disqualification, the State agency must provide notice "that the institution and **the responsible principals and responsible individuals have been disqualified**." 7 C.F.R. § 226.6(c)(3)(iii)(E)(1) (emphasis added). Petitioners argue there is not substantial evidence to support a judgment against McClain as an individual because the Department did not present evidence that McClain was the "alter ego" of Daycare. (Petitioners' Br. at 64.) However, Petitioners misstate the standard for individual disqualification under the Program regulations. Those regulations define "[r]esponsible principal or responsible individual" as:

> (a) A principal, whether compensated or uncompensated, who the [s]tate agency or FNS determines to be responsible for an institution's serious deficiency;

> (b) Any other individual employed by, or under contract with, an institution or sponsored center, who the [s]tate agency or FNS determines to be responsible for an institution's serious deficiency; or

> (c) An uncompensated individual who the [s]tate agency or FNS determines to be responsible for an institution's serious deficiency.

7 C.F.R. § 226.2. As testified to by Daycare Director, McClain is the owner of Daycare. (R.R. at 142b.) This is further evidenced by Daycare's July 2012 CAP, which McClain signed as "owner," and the letter the Department sent to confirm

28

receipt of that CAP, which was addressed the same. (*Id.* at 45a.) Moreover, the CAP contained an acknowledgment by McClain, as an authorized official of Daycare, that the consequence of not undertaking corrective action would result in serious deficiency procedures against her. (Transcript of Hearing with Exhibits, C.R. Item No. 7, Petitioners' Ex. A26, at 140.) Finally, the Termination Notice specifically stated that McClain is a responsible principal for Daycare's deficiencies. (FOF ¶ 79.) As owner of Daycare, who has acknowledged and been informed of her responsibilities for Daycare's deficiencies on various occasions, McClain is a responsible principal or individual, and the regulations mandate her individual disqualification. 7 C.F.R. § 226.6(c)(3)(iii)(E)(1).

## VI. Conclusion

The Department's Termination Notice and recovery of overpayment is not barred by the equitable doctrines of laches and estoppel. Further, based on the Hearing Examiner's evidentiary weight determinations, there is substantial evidence to support the Hearing Examiner's findings of fact, which, in turn, support the dismissal of Petitioners' appeal from the Termination Notice, allowing the Department to proceed in recovering the overpayment, terminating Daycare's contract, and disqualifying Daycare and McClain from future participation in the Program. Moreover, we discern no error of law or constitutional violations in the Determination. Accordingly, we affirm.

 

**RENÉE COHN JUBELIRER,** Judge

29

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

JoeAnna McClain, d/b/a, Nana's     :
Daycare and JoeAnna McClain,     :
individually and Nana's Daycare,     :
LLC,     :
                  Petitioners     :
    :
          v.     :   No. 1656 C.D. 2017
    :
Pennsylvania Department of     :
Education, Division of Food and     :
Nutrition,     :
              Respondent     :

# **O R D E R**

**NOW**, January 3, 2019, the September 18, 2017 Order of the Hearing Examiner of the Pennsylvania Department of Education is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge