# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert Philip Tuerk,             :
                Petitioner     :
                                   :
           v.                :   No. 894 C.D. 2021
                                   :   Submitted: March 4, 2022
The Pennsylvania Department      :
of Education, Bureau of School       :
Leadership and Teacher Quality,     :
Division of Certification Services,    :
                Respondent    :

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
                   HONORABLE ELLEN CEISLER, Judge
                   HONORABLE STACY WALLACE, Judge

<u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**      **FILED: March 24, 2023**

Robert Philip Tuerk (Petitioner), pro se, petitions for review of the Acting Deputy Secretary of Education's (Acting Deputy Secretary)[1] July 14, 2021, Adjudication and Order affirming a decision by the Pennsylvania Department of Education (Department), Bureau of School Leadership and Teacher Quality (Bureau), Division of Certification Services (Division), denying Petitioner's

---

[1] Petitioner's appeal to the Secretary of Education and the Order issued on July 14, 2021, was decided by Dr. Tanya I. Garcia, Ph.D., Acting Deputy Secretary and Commissioner for Postsecondary and Higher Education. Then-Secretary of Education Noe Ortega had recused from any decision in Petitioner's appeal because Mr. Ortega had made the initial denial decision on Petitioner's application in his previous role with the Department as Deputy Secretary and Commissioner for Postsecondary and Higher Education. Dr. Garcia, who had no previous involvement in Petitioner's matter, was appointed to make the determination due to Mr. Ortega's conflict.

application for an emergency day-to-day substitute teacher permit because Petitioner failed to provide satisfactory evidence of good moral character as required by statute and regulations. Following our review, we affirm.

## I.    BACKGROUND

On January 17, 2019, Petitioner filed an application for an emergency permit to serve as a day-to-day substitute teacher. (Joint Exhibit (Jt. Ex.) 1, Reproduced Record (R.R.) at 84a-86a.) In response to the question, "Have you ever had any certificate or license for any profession denied, revoked, suspended, surrendered or received a public reprimand in this or any other state, territory or country," Petitioner responded, "Yes." (*Id.* at 85a.) On August 1, 2019, Petitioner submitted a second application and responded in the same way. (Jt. Ex. 2, R.R. at 87a-89a.) Thereafter, Petitioner was asked to supply additional information to the Bureau related to his response.

In a letter, dated December 9, 2019, the Bureau denied Petitioner's application, explaining that to become certified, an applicant must satisfy the requirements of Sections 1204, 1205, 1209 of the Public School Code of 1949, 24 P.S. §§ 12-1204, 12-1205, 12-1209,[2] and the State Board of Education's regulations

_____

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§12-1204, 12-1205, and 12-1209. Section 1204 provides, in pertinent part:

> The Secretary of Education may grant a provisional college certificate to every person who presents to the Department . . . satisfactory evidence of **good moral character**, and of being a graduate of an approved college or university, who has completed such work in education as may be required by the standards of the State Board of Education. . . .

24 P.S. § 12-1204 (emphasis added).
    Section 1205 states, in pertinent part:
**(Footnote continued on next page…)**

2

in 22 Pa. Code § 49.12[3] by showing that the applicant is of good moral character. The Bureau found that Petitioner had not demonstrated he was of good moral character because:

> Over an extended period of time, [Petitioner] knowingly continued to practice law without proper admission to the Bar. As indicated in the supporting documents and [Petitioner's] statement to the [] Department . . . , [Petitioner] failed to accept personal responsibility for [his] actions. Due to [Petitioner's] conduct, [Petitioner] ha[s] been disbarred in both Pennsylvania and Florida. [Petitioner's] most recent disbarment occurred as recently as February 2018.

(*See* Denial Letter, dated December 9, 2019, at 1 (unnumbered).) Noe Ortega, then Deputy Secretary and Commissioner for Postsecondary and Higher Education, signed the denial letter on the Bureau's behalf.

## A. Evidentiary Hearing

Petitioner thereafter filed an appeal with the Secretary of Education on January 6, 2020, requesting an evidentiary hearing. A Hearing Officer was appointed and, on July 27, 2020, a de novo evidentiary hearing was held. At the hearing, the parties stipulated to the admission of numerous joint exhibits, including

---

The Secretary of Education shall issue a permanent college certificate to every graduate of an approved college or university, and of such departments therein as are approved by him, when such graduate furnishes satisfactory evidence of **good moral character**. . . .

24 P.S. § 12-1205 (emphasis added).

Section 1209 prohibits the Department from granting a teaching certificate to any person who "[d]oes not have a **good moral character**." 24 P.S. § 12-1209 (emphasis added).

[3] The State Board of Education's regulations require that "every professional employee certified or permitted to serve in the schools of this Commonwealth shall . . . [b]e of **good moral character**." 22 Pa. Code § 49.12 (emphasis added).

Petitioner's two applications for an emergency permit; a February 12, 2018 Order of the Supreme Court of Pennsylvania reciprocally disbarring Petitioner from the practice of law based upon a disbarment by the Supreme Court of Florida and other related documentation; an October 15, 2015 Order of the Supreme Court of Pennsylvania suspending Petitioner for a period of one year and one day and other related documentation; a supplemental letter of explanation Petitioner provided to the Bureau related to the circumstances of his disbarment; a March 2016 Report of Referee Accepting Consent Judgment in the Supreme Court of Florida related to disciplinary proceedings involving Petitioner; numerous letters of reference;[4] and some email correspondence between Petitioner and a state representative's office about the status of his applications.

According to the joint exhibits admitted at the hearing, the basis of Petitioner's October 2015 suspension from the Pennsylvania Bar related to his application for admission to the United States District Court for the Eastern District of Pennsylvania (Eastern District) in 2012. According to the Eastern District's Local Rules,[5] Petitioner was to inform the Eastern District in writing if he previously had been subjected to public discipline and then establish that he was qualified to practice law

---

[4] The reference letters were from Stephen A. Glassman, former chair of the Pennsylvania Human Relations Commission; David Hawkins, a forensic scientist; Laird Hansberger, who knew Petitioner from traffic court; David Wayne Waties, an attorney; and Leon A. King, II, an attorney and Deputy Commissioner for the Maryland Department of Public Safety and Correctional Services, Division of Pre-Trial Detention and Service and former Commissioner of the Philadelphia prison system.

[5] Local Rule 83.5(f) provides, in pertinent part:

> An attorney applying for first-time admission to the bar of this court must simultaneously inform the court of any previous public discipline by any other court of the United States or the District of Columbia, or by a court of any state, territory, commonwealth or possession of the United States and of any conviction for a "serious crime" as defined in these rules.

E.D. Pa. R.Civ.P. 83.5(f).

before the Eastern District. (R.R. at 102a-03a.) In 1996, the Supreme Court of Pennsylvania suspended Petitioner from the Bar of the Commonwealth of Pennsylvania for a period of one year and one day due to his failure to disclose his prior expunged arrest from 1985 on his application for admission to the Pennsylvania Bar. (*Id.* At 101a.) By order, dated April 17, 2001, Petitioner's license to practice law in Pennsylvania was reinstated. (*Id.*) While Petitioner alleged he verbally informed the admissions manager in the Eastern District that he had been subjected previously to professional discipline, he did not indicate as much in writing as required by the Local Rules and application, and he continued to practice law before the Eastern District even after receiving a rule to show cause questioning his admission. (*Id.* at 103a.) Finding that he knowingly failed to comply with the requirements for admission to practice before the Eastern District and falsely swore on his Application of Admission that he had complied with those requirements, the Pennsylvania Supreme Court suspended Petitioner's license to practice law a second time for a period of one year and one day on October 15, 2015.

The record reveals that the bases for the Florida disbarment and subsequent reciprocal disbarment from Pennsylvania are as follows. On January 28, 2002, Petitioner was admitted to the Florida Bar. On March 24, 2016, his license to practice law in Florida was suspended by the Supreme Court of Florida for one year for unspecified reasons. (R.R. at 96a.) A few months later, on August 31, 2016, the Supreme Court of Florida again suspended Petitioner from the practice of law, this time for three years, due to his failure to file a response to a rule to show cause order issued by the Court. (R.R. at 94a.) On July 20, 2017, Petitioner was disbarred in Florida for representing to that court that he had not received notice of proceedings against him, despite a signed return receipt, acknowledging same. (R.R. at 91a.) On

February 12, 2018, the Supreme Court of Pennsylvania reciprocally disbarred him from the practice of law in the Commonwealth.

The joint exhibits were admitted at the hearing. Petitioner also testified on his own behalf, and Alicia Steinhauer, a certification specialist with the Department (Certification Specialist), testified for the Bureau. Petitioner testified that on January 17, 2019, he had applied for an emergency substitute teacher permit under the auspices of Kelly Services to obtain employment with the School District of Philadelphia. (Notes of Testimony (N.T.) at 10.) When no action was taken on his first application, Petitioner filed a second on August 1, 2019, and that application was denied on December 11, 2019. (*Id.* at 10-11, 13.)

> Petitioner explained his feelings regarding his disbarments as follows:
>
> So I'd like to just, again, state my regret for my behavior in February 2012, for my faux pas, misjudgment, et [ ] cetera with my sponsor and the admissions manager in federal court.
>
> Those facts can be looked at, if you want, off the record. I don't want to talk about all those facts. They were appealed to the United States Supreme Court, both states' decisions, Florida and Pennsylvania, and the facts are all contained in my writ for acceptance of my case before the Supreme Court of the United States, and those facts were not responded to by either of those bodies, including the Florida Bar and the Disciplinary Board of the Supreme Court of Pennsylvania, and there's no reason to go into those facts.
>
> Again, I do regret my behavior. I should have taken further action on that date to try to correct what was occurring.

(*Id.* at 13.) Petitioner testified that he was unaware he needed to be admitted to the federal bar separate from the state bar. (*Id.* at 17-18.) Petitioner also attempted to admit into evidence the results of an online test he self-administered to illustrate his good moral character; however, the Hearing Officer sustained the Bureau's

6

objection on relevancy grounds. (*Id*. at 23-24.) Petitioner declared several times he had shown remorse for his past actions and stressed his numerous volunteer activities with youth, the sick, animals, and his church as proof of his reform. He also explained that "a few states are actually moving away from this moral character component because of this, fraught with subjectivity and misuse." (*Id.* at 25.) He further noted he had been truthful on both of his substitute teacher applications and passed the necessary clearances required for his applications. (*Id*. at 24-30.)

On cross-examination, Petitioner stated he was initially suspended from the Pennsylvania Bar for an "inadvertent mistake on [an] application." (*Id*. at 31.) He also denied failing to disclose to the Eastern District that he had previously been disciplined stating that he had verbally told the admissions manager twice, although the Eastern District requires notice in writing. (*Id*. at 33-35.) Petitioner also admitted that while he appealed the matter to the United States Supreme Court, the 2015 order was never overturned. (*Id*. at 35.) Petitioner was questioned about statements he made appearing to deflect responsibility for his actions, which he denied, pointing to other statements where he accepted responsibility and expressed remorse. (*Id.* at 36-41.)

Certification Specialist testified that she reviews certification applications to determine an applicant's qualifications and gathers more information if needed. (*Id.* at 43-44.) Certification Specialist was familiar with Petitioner's application because he answered yes to one of the background questions, resulting in it being assigned to her. (*Id*. at 44.) Certification Specialist was aware Petitioner filed two applications, one in January 2020 for the 2019-20 school year and another in August 2020 for the 2020-21 school year. (*Id*. at 44-45.) She further explained that an emergency permit is only valid for the school year, so if a determination is not made

7

before the end of a school year, a new application is needed for the following school year. (*Id.*) When a good moral character issue is triggered by an application, Certification Specialist explained that the amount of time to review the application is dependent upon many factors, including how quickly information is provided and whether additional information or clarification is needed. (*Id.* at 45.) Certification Specialist explained that all information provided is then given to the Deputy Secretary who decides whether an application will be approved or denied. (*Id.* at 45-46, 48.) On cross-examination, Certification Specialist acknowledged that Petitioner provided all the necessary clearances. (*Id.* at 46.) She further acknowledged that in one letter, Petitioner stated he was remorseful, but explained that her job is to "gather the documents" and she was "looking for the documents that led to the conduct that led to the disbarment." (*Id.* at 47.) Certification Specialist also explained that while an application can take as little as four weeks to process, when one's good moral character is at issue, the processing time of an application can take anywhere from eight weeks to six months. (*Id.* at 47.)

After Certification Specialist again testified that she only gathers documentation, which is then provided to the deputy secretary to make a determination, Petitioner orally requested a continuance of the hearing to enable him to cross-examine Mr. Ortega regarding his review of Petitioner's application for a teacher certification, as he was the one who made the decision thereon. (*Id.* at 48-49.) The Hearing Officer noted that Petitioner was aware Mr. Ortega was the one who made the initial decision, as his name was on the denial letter, and at no time prior to the hearing did Petitioner seek to subpoena Mr. Ortega. (*Id.* at 50-51.) Petitioner argued Certification Specialist represented in an email that she was the decision maker on his application, pointing to Joint Exhibit 9, which states "I will

8

be your evaluator and will be one of the individuals reviewing your documentation for approval or denial of the application." (*Id.* at 51; Jt. Ex. 9.) Oral argument ensued, and the Hearing Officer indicated she would continue the hearing and required the parties to file briefs on this issue. (*Id.* at 52-53.) Before the hearing was continued, though, Petitioner indicated he had more questions for Certification Specialist and, "in the interest of not having to call [Certification Specialist] back," cross-examination continued after scheduling was discussed. (*Id.* at 53, 57.)

Upon further cross-examination, Certification Specialist testified she did not call any of Petitioner's references as she "didn't have any further questions." (*Id.* at 59.) Petitioner sought to question Certification Specialist as to the content of the reference letters and to the alleged failure to process his first application, to which counsel for the Bureau objected on the grounds that the letters speak for themselves and are evidence and the timing of the review was irrelevant. (*Id.* at 59-63.) Petitioner indicated he would proceed to questioning the witness about the second application, which he did, again inquiring of the witness as to the reason for the delay in processing his second application. This question drew another relevance objection, which the Hearing Officer sustained. (*Id.* at 63-66.) Certification Specialist testified she was aware of inquiries from a state representative's office about the status of Petitioner's second application. (*Id*. at 67.) Certification Specialist also acknowledged not requesting any more information from Petitioner about his application after August 1. (*Id.* at 68.) Petitioner then stated he had "[n]o further questions." (*Id.*)

On redirect, Certification Specialist testified that at least 1000 applications are referred annually for good moral character reviews. (*Id.* at 69.) On re-cross, she explained that all of those are referred to her. (*Id.* at 70.) When asked why her email

9

indicated she was "one of the individuals" who would be reviewing Petitioner's application, Certification Specialist explained:

> I can explain that every application that has a yes answer is assigned to me, so I am the only person that will review your qualifications to make sure that you qualify for that permit, or say it was a certificate. I'm the only person that looks at that. I do that.
>
> I review your application in that sense. I review your application to determine that there's documentation to give it to the decision maker.

(*Id.* at 70.) Certification Specialist testified "[t]he decision maker reviews . . . that documentation." (*Id.* at 70-71.) After he finished questioning Certification Specialist, Petitioner again indicated he had "[n]o further questions[,]" and the hearing adjourned. (*Id.* at 73.)

On January 21, 2021, Petitioner filed a motion to recall Certification Specialist "for impeachment and further cross-examination purposes," which the Bureau opposed (Certified Record (C.R.) Items 8, 10.) On February 8, 2021, Petitioner filed his brief, and the Bureau filed its brief on March 8, 2021. (C.R. Items 5, 7.)

### B. Adjudication and Order

Thereafter, the Hearing Officer issued a proposed adjudication and order, to which Petitioner filed exceptions. (*See* C.R. Items 3-4.) Subsequently, the Acting Deputy Secretary denied the motions to call Mr. Ortega as a witness and to recall Certification Specialist and affirmed the Bureau's decision in an Adjudication and Order entered on July 14, 2021. In support of her holding that Petitioner does not have good moral character, the Acting Deputy Secretary made 49 Findings of Fact, in which she detailed Petitioner's disciplinary history in Pennsylvania and Florida, as outlined above. The Acting Deputy Secretary further found that Petitioner

"repeatedly argued that his disbarments resulted from inadvertent mistakes and/or misunderstandings." (Adjudication, Finding of Fact (FOF) ¶ 24.) The Acting Deputy Secretary also determined Petitioner did not express regret for his actions and, as detailed in the Supreme Court's order, did not accept full responsibility for his actions. (*Id.* ¶¶ 25-26.) Acting Deputy Secretary further found Petitioner did not try to subpoena Mr. Ortega before the hearing and twice stated he had no further questions for Certification Specialist.

In explaining the reasoning behind her decision, Acting Deputy Secretary began by stating she "f[ou]nd[] [Petitioner] *not credible*" and that he "*has not established that he has good moral character*." (*See* Adjudication at 11 (emphasis in original).) She explained that when the Bureau requested additional information due to Petitioner's failure to provide a substantive explanation for his suspensions and/or disbarments, Petitioner indicated that his 2015 suspension from the Pennsylvania Bar was the result of an "administrative admission process error based upon the admission manager's directive and the oral representation of the sponsor in the courtroom" and that his Florida disbarment was due to a "breakdown in communication that was not known to him." (*Id*. at 11-12.) To the contrary, Acting Deputy Secretary stated that the Supreme Court of Pennsylvania concluded Petitioner was aware of the admission procedure and did not follow it and then knowingly continued to practice law without proper admission to the Eastern District. (*Id.* at 12.) The Acting Deputy Secretary also stated that there was a signed receipt indicating that Petitioner's "representation regarding a lack of service was untrue." (*Id.*) The Acting Deputy Secretary concluded:

> By continuing to attempt to explain away the discipline imposed by []
> both the Florida and Pennsylvania Bars, [Petitioner] continues to fail to
> accept responsibility for his conduct. Therefore, the [Acting Deputy]

11

> Secretary affirms the [Bureau]'s decision denying [Petitioner's] application for a teacher certification as an emergency day[-]to[-]day substitute.

(*Id.*)

In denying Petitioner's request for a continued hearing to cross-examine Mr. Ortega regarding the review of his application, the Acting Deputy Secretary initially stressed that Petitioner had failed to request a subpoena at the time he was notified of the hearing. She further found that such request would violate Mr. Ortega's deliberative process privilege as a high ranking official pursuant to *KC Equities v. Department of Public Welfare*, 95 A.3d 918 (Pa. Cmwlth. 2014). (Adjudication at 12-13.) Additionally, upon noting that Petitioner had completed his questioning of Certification Specialist, the Acting Deputy Secretary denied his request for a continued hearing to further cross-examine her. (*Id.* at 13.)

## II.   ISSUES PRESENTED

Petitioner filed a timely Petition for Review with this Court on August 13, 2021, challenging Acting Deputy Secretary's Adjudication and Order on multiple bases. Petitioner argues the reasons for the denial were "erroneous, insufficient, and collaterally estopped" and that he presented sufficient evidence of good moral character. (Petitioner's Brief (Br.) at 12.) He also argues it was error to exclude evidence of the written character tests. Petitioner further asserts Mr. Ortega's refusal to accept a subpoena to testify, combining of prosecutorial and adjudicative functions, and designation of Acting Deputy Secretary to adjudicate this matter resulted in a violation of his due process rights and other constitutional violations. Moreover, Petitioner argues he should have been permitted to recall Certification Specialist as a witness. Petitioner further alleges he was discriminated against on

12

the basis of sexual orientation. Finally, he asserts the character standard is void for vagueness. The Court addresses each of these issues in turn.

## III.  DISCUSSION

Preliminarily, it is within the purview of an administrative agency to determine the credibility of witnesses and to determine the weight of the evidence. *Kauffman Metals, LLC v. Dep't of Lab. & Ind. Off. of Unemployment Tax Servs.*, 126 A.3d 1045 (Pa. Cmwlth. 2015). The Acting Deputy Secretary as the ultimate factfinder herein served as the sole arbiter of credibility and had the responsibility to resolve conflicts in testimony arising from inconsistencies in a witness's testimony and inconsistencies arising from the testimony of two or more witnesses. *Johnson v. Workers' Comp. Appeal Bd. (Abington Mem'l Hosp.),* 816 A.2d 1262, 1268 (Pa. Cmwlth. 2003). *See also Grant v. Bd. of Sch. Dirs. of the Centennial Sch. Dist.*, 403 A.2d 157 (Pa. Cmwlth. 1979). We are bound by the factfinder's credibility determinations, as questions of credibility are not subject to re-evaluation on judicial review. *Peak v. Unemployment Comp. Bd. of Rev.*, 501 A.2d 1383, 1386, 1388 (Pa. 1985). Thus, this Court's review of the Acting Deputy Secretary's decision is limited to a determination of whether Petitioner's constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Pardue v. Dep't of Educ.*, 815 A.2d 1162, 1165 n.10 (Pa. Cmwlth. 2003).

### A.  Whether the Adjudication was erroneous

In support of his first argument, which is essentially a substantial evidence challenge, Petitioner states he passed the necessary clearances and satisfied the requirements to obtain an emergency day-to-day substitute teacher permit. He

stresses his professional endeavors, volunteer work, and character references evince his good moral character and that some states are disregarding good moral character requirements for licensure. (Petitioner's Br. at 12-15, 39.) Petitioner adds that the "[a]djudication includes several fabrications, omissions, and mischaracterizations" of certain facts pertaining to his disbarments and expressions of remorse. (*Id.* at 15-22.) He further argues that he already has been severely reprimanded for his conduct, which occurred years ago; therefore, the Bureau should be estopped from revisiting prior attorney disciplinary proceedings when considering his permit application. (*Id*. at 23-26.)

In response, the Bureau stresses that this Court previously has held that it is reasonable to seek a forthright acknowledgement of wrongdoing from a licensee in consideration of reinstatement of a license and that state licensing agencies have denied applicants for civil conduct that has resulted in discipline. (Bureau's Br. at 14, 16) (citing *Krichmar v. State Bd. of Vehicle Mfrs., Dealers & Sales Persons*, 850 A.2d 861 (Pa. Cmwlth. 2004); *Sehbai v. Bureau of Pro. & Occupational Affs., State Bd. of Med.*, (Pa. Cmwlth., No. 1743 C.D. 2016, filed Sept. 27, 2017)).[6] The Bureau finds no merit to Petitioner's reference to other states' views of the good moral character determination as this is still a vital component of the Public School Code. (*Id*. at 17-18.) The Bureau also states Petitioner's claims that collateral estoppel should be applied herein are unsupported, as the four elements of collateral estoppel cannot be satisfied in this matter. (*Id*. at 18-20.)

---

[6] Unreported panel decisions of this Court may be cited for their persuasive value, but not as binding precedent, pursuant to Rule 126(b)(1) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 126(b)(1), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

14

An examination of the record supports the Acting Deputy Secretary's findings that Petitioner represented the circumstances surrounding his suspensions and subsequent disbarments in Florida and Pennsylvania as unknowing or caused by others, thereby deflecting blame from himself. In his written response to the Division dated March 19, 2019, Petitioner indicated that his 1996 and 2015 suspensions were for an "inadvertent mistake" and an "administrative admission process error," respectively. (Jt. Ex. 10, R.R. at 132a-33a.) In his Supplemental Letter of Explanation to the Division, Petitioner states he relied upon others, namely the admissions manager and his sponsor for admission to the Eastern District, and now is "more careful with assurances from others in positions of power." (Jt. Ex. 5, R.R. at 117a-18a.) Petitioner also explained he was disbarred in Florida "due to a breakdown in communication unbeknownst to [him]" and his reciprocal disbarment in Pennsylvania followed. (Jt. Ex. 10, R.R. at 132a-33a.) While Petitioner claimed he was not aware of another Rule to Show Cause that had been issued, there was evidence that Petitioner signed for it. (R.R. at 91a-92a.)

Based on this and other conduct by Petitioner, the Acting Deputy Secretary found Petitioner "continu[es] to attempt to explain away the discipline imposed by both the Florida and Pennsylvania Bars [and Petitioner] continues to fail to accept responsibility for his conduct." (Adjudication and Order at 12.) While Petitioner states he is remorseful and assumes responsibility for his actions, Acting Deputy Secretary did not credit this testimony, (Adjudication and Order at 11), and as discussed, there is substantial evidence to support the Acting Deputy Secretary's findings to the contrary.

While Petitioner argues the conditions which gave rise to his suspensions and disbarments happened in the past and that he has made amends for his actions, the

Acting Deputy Secretary gave weight to Petitioner's recent statements to the Division regarding those multiple suspensions and disbarments to support her determination that Petitioner was not credible when he testified he felt remorse and had taken responsibility for his past actions. In urging this Court to find otherwise, Petitioner essentially asks us to reweigh the evidence and make different findings and credibility determinations based upon these alleged conflicts in testimony. This we are unable to do, for our standard of review precludes such an approach to the review of the Division's factual findings. *M.T. v. Dep't of Educ.*, 56 A.3d 1, 9 (Pa. Cmwlth. 2010). *See also Bethea-Tumani v. Bureau of Pro.& Occupational Affs., State Bd. of Nursing*, 993 A.2d 921, 929-31 (Pa. Cmwlth. 2010) (holding the Board of Nursing issued a reasoned decision when it gave more weight to the petitioner's convictions than to the mitigating circumstances and the petitioner's statements of remorse and reform).

Petitioner also appears to challenge various findings as erroneous. However, a review of those findings shows they were not inaccurate or, if there were any error, it was immaterial to the determination as it relates to incidental details. For example, Petitioner takes issue with Finding of Fact 3 on the basis it does not mention he filed two applications. (Petitioner's Br. at 15.) The finding, which states he applied for a teacher certification as an emergency day-to-day substitute, is not inaccurate even if it does not specifically mention Petitioner's two applications. Nor has Petitioner shown how this alleged omission adversely impacts him. He also takes issue with the Acting Deputy Secretary's use of the word "application" to describe the form he filled out for admission to the Eastern District. (Petitioner's Br. at 16 (citing FOF 14).) Again, assuming this characterization was an error, Petitioner does not aver how he was harmed by it. Petitioner also asserts Finding of Fact 15 "misstates the

16

facts" because it does not mention Petitioner spoke to the admissions manager twice. (Petitioner's Br. at 16.) However, Finding of Fact 15 simply states Petitioner "verbally revealed" his prior discipline to the admissions manager. (FOF ¶ 15.) It does not specify how many times, and Petitioner does not explain the importance of this alleged error, assuming there was error.

Similarly, we are not persuaded by Petitioner's argument that we should look to the alleged trend in other jurisdictions not to consider the good moral character requirement in granting applications for teaching certificates or substitute permits. As noted above, multiple sections of the Public School Code have long required an applicant to provide satisfactory evidence to the Secretary of Education that he or she possesses good moral character before receiving a Pennsylvania certificate or permit. *See* 24 P.S. §§12-1204, 1205, 1209, and 22 Pa. Code § 49.12. Simply put, it is not an appellate court's role under our tripartite system of governance to engage in judicial legislation and to rewrite a statute. *See In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591, 611 (Pa. 2020), *cert. denied sub nom. Donald J. Trump for President, Inc. v. Degraffenreid*, 141 S. Ct. 1451 (2021). As our Supreme Court has stated:

> As always, our interpretive function requires us to identify the intent of the legislature, and we begin with the presumption that unambiguous statutory language embodies that intent, requiring no further investigation. We may not disregard the Act's unambiguous language in service of what we believe to be the spirit of the law.

*Sivick v. State Ethics Comm'n*, 238 A.3d 1250, 1263 (Pa. 2020) (footnote omitted).

With regard to Petitioner's contention that collateral estoppel should be applied, we first observe:

> Collateral estoppel, or issue preclusion, is designed to prevent relitigation of questions of law or issues of fact, which have already been litigated in a court of competent jurisdiction. Collateral estoppel

17

is based on the policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise.

*Plaxton v. Lycoming Cnty. Zoning Hearing Bd.,* 986 A.2d 199, 208 (Pa. Cmwlth. 2009) (citations and quotation marks omitted). For the collateral estoppel doctrine to apply, Petitioner must show the following criteria have been met:

> (1) the issue decided in the prior case is identical to the one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the doctrine is asserted was a party or in privity with a party in the prior case and had a full and fair opportunity to litigate the issue; and (4) the determination in the prior proceeding was essential to the judgment.

*Pucci v. Workers' Comp. Appeal Bd. (Woodville State Hosp.)*, 707 A.2d 646, 648 (Pa. Cmwlth. 1998) (citation omitted).

Collateral estoppel does not apply in this matter because the issues are not identical. Any action the Supreme Court of Pennsylvania took to discipline Petitioner when he was a licensed attorney is separate from the determination the Bureau had to make as to whether Petitioner lacked the moral character to receive a teaching permit. Furthermore, the Bureau was not a party to the attorney disciplinary proceedings, nor is it in privity with the Supreme Court. The disciplinary proceedings also are not essential to the underlying proceeding. Indeed, the Bureau did not deny Petitioner's application because he was disbarred in Florida and Pennsylvania, but rather did so upon its proper consideration of Petitioner's deliberate mischaracterization of the circumstances surrounding that discipline.

### B. Whether evidence of character tests was properly excluded

Petitioner next contends the results of written character tests he completed online were relevant to a determination of his good moral character and should have

18

been admitted into evidence at his hearing. In the less than one page of argument he devotes to this issue, Petitioner reasons that the tests were the product of "reputable sources" and are critical to a determination of his morality. He states this is especially so given that the Hearing Officer is not bound by the technical rules of evidence. (Petitioner's Br. at 27.) The Bureau responds that the online character tests are irrelevant, and the Hearing Officer acted within her discretion to exclude them. (Bureau's Br. at 22.)

Admission of evidence is within the purview of the factfinder. While it is true that Commonwealth agencies are not "bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received," Section 505 of the Administrative Agency Law, 2 Pa.C.S. § 505, based on Petitioner's testimony, and after hearing argument pertaining to the relevancy objection of Bureau's counsel, the Hearing Officer decided not to admit Petitioner's self-administered, online test results into the record. We discern no error in the Hearing Officer's sustaining the relevancy objection, as by Petitioner's own admission he took the test "recently," after his application had been denied, and Petitioner's live testimony before the Hearing Officer provided Petitioner the opportunity to explore his moral character on the record. The Acting Deputy Secretary, as the ultimate factfinder, was permitted to determine the credibility of such testimony from the reading of a transcript. *Fisler v. State Sys. of Higher Educ., California Univ. of Pa.*, 78 A.3d 30, 42 (Pa. Cmwlth. 2013).

### C. Whether due process requires the opportunity for Petitioner to call Mr. Ortega as a witness and recall Certification Specialist for further questioning

In his related third and fourth issues, Petitioner contends due process required that he be given an opportunity to confront and cross-examine Mr. Ortega as an

19

adverse witness because Certification Specialist's testimony in his absence constituted hearsay. Petitioner reasons that because Mr. Ortega made the decision to deny Petitioner's permit application, only Mr. Ortega can be cross-examined regarding that decision, not the "designation by fiat of another person under his control, who was not involved in this matter, to testify by proxy in Mr. Ortega's stead regarding his action upon Petitioner's Application." (Petitioner's Br. at 29.) For this reason, Petitioner posits he should have been permitted to recall Certification Specialist to impeach her and to further explore her involvement and/or recommendation concerning Petitioner's application. (Petitioner's Br. at 27-33.)

The Bureau counters that the Acting Deputy Secretary properly served as the decision maker as to whether Petitioner had established his good moral character and further cautions that under *KC Equities*, 95 A.3d 918, Mr. Ortega qualified as a "high ranking administration official" who enjoyed the deliberative process privilege. Bureau also argues that Petitioner had the opportunity to cross-examine Certification Specialist and made no request prior to the conclusion of the hearing to recall her, but instead indicated that he had "[n]o further questions." (*See* N.T. at 73.) Petitioner did not file the motion to recall Certification Specialist until five months later in January 2021 when he filed his brief pertaining to whether he could call Mr. Ortega as a witness. (Bureau's Br. at 23-24, 27-28.)

In rejecting similar claims, this Court's previous analysis is instructive:

> The process of administrative agency heads acting on the recommendations of officials who are more familiar with the facts, by reason of their own investigation, is well-established. *See, e.g., Aaron's Boarding Home v. Dep't of Pub. Welfare*, . . . 541 A.2d 63 ([Pa. Cmwlth.] 1988) (revocation may be based on testimony of inspector who investigated complaint). Indeed, recommendations are routinely relied upon by the ultimate agency decision[]makers.

20

Further, [the petitioner's] challenge that an official who signs an action must have first-hand knowledge of its underlying content is likewise unsupported by applicable law. *See J.C. Penney Cas. Ins. Co. v. Dep't of Ins.*, . . . 402 A.2d 558 ([Pa. Cmwlth.] 1979) (same agency may investigate and prosecute violations; Commissioner need not investigate a case personally). To accept [the petitioner's] position that first-hand knowledge is a prerequisite for an agency head's (or its designee's) action would frustrate administrative practice and the hierarchy established by the Administrative Code,[7] as well as thwart the separation of administrative functions. *See generally Lyness v. State Bd. of Med.*, . . . 605 A.2d 1204 ([Pa.] 1992) (precluding commingling of administrative functions).

Fact-finders or investigators become familiar with details that inform the ultimate decision[]maker. These observations are invaluable when it is impractical for all agency decision[]makers to review the [evidence] and interview witnesses themselves. Thus, the process [the agency] uses is appropriate and pragmatic.

Moreover, the record is clear. [The agency] investigator . . . accumulated documentation regarding her observations of [the petitioner]. She then provided the [licensing inspection summaries], and any additional necessary documentation, to the next level. That enabled the Acting Deputy Secretary to issue final approval, either accepting or rejecting the recommendation, based on the accompanying materials. . . .

That an agency official with decision-making authority does not have first-hand knowledge of the facts, and relies on reports and documentation supplied to him, does not evince a flawed process. To the contrary, it is consistent with agency hierarchy and the principle of delegation. *Cf. R. v. Dep't of Pub. Welfare*, . . . 636 A.2d 142, 146 ([Pa.] 1994) (credibility recommendations made by administrative hearing officer who did not personally see all the witnesses).

. . . .

As to the subpoena directed to Acting Deputy Secretary [], [the agency] properly denied a subpoena compelling his testimony. An Acting Deputy Secretary would qualify as a high administration official because he has decision[]making authority. It is typical to refuse such

---

[7] Act of April 9, 1929, P.L. 177, *as amended* 71 P.S. §§1-1709, 2106.

21

subpoenas to protect high-ranking officials from such intrusions. *Halderman v. Pennhurst State Sch. & Hosp.*, 559 F. Supp. 153 (E. D. Pa. 1982) (explaining subpoenas should only be required upon certification that testimony of [the agency] department head was necessary and not available from a lesser-ranking official; granting motion to quash as to [the] Secretary).

Furthermore, [the petitioner] reveals that its reason in requesting a subpoena compelling the Acting Deputy Secretary's testimony was to learn about the deliberative process. The reason that subpoenas to high-ranking officials are denied is precisely to ensure that executive or deliberative process is protected. *See Commonwealth v. Vartan,* . . . 733 A.2d 1258 ([Pa.] 1999). The deliberations to which [the petitioner] sought access are protected by the deliberative process privilege. *See In re Interbranch Com[m]'n on Juvenile Justice,* . . . 988 A.2d 1269 ([Pa.] 2010); *Vartan*[, 733 A.2d at 1264-66].

In addition, non-privileged testimony was available from lesser-ranking officials . . . . [The investigator] had first-hand knowledge of the violations as she conducted both the March Inspection and the April Inspection. Therefore, she was the appropriate witness to testify regarding observed violations that formed the basis for the Revocation Letter.

*KC Equities*, 95 A.3d at 928-29, 933-34.

Applying the aforesaid logic herein, we find no error in the Acting Deputy Secretary's conclusion that Petitioner had been afforded due process as he had been given reasonable notice and an opportunity to be heard. First, consistent with *KC Equities*, notwithstanding Petitioner's failure to subpoena Mr. Ortega prior to the hearing, a subpoena to examine Mr. Ortega was both unnecessary in light of Certification Specialist's hearing testimony and violative of Mr. Ortega's deliberative process privilege. Moreover, as to Petitioner's motion to recall Certification Specialist, Petitioner failed to place a timely objection on the record at the hearing when Certification Specialist's testimony concluded; thus, he has waived this argument. As the Pennsylvania Supreme Court has stated:

> [I]t is axiomatic that issues are preserved when objections are made timely to the error or offense. *See Commonwealth v. May*, [ ] 887 A.2d 750, 761 ([Pa.] 2005) (holding that an "absence of contemporaneous objections renders" an appellant's claim waived); and *Commonwealth v. Bruce*, [ ] 916 A.2d 657, 671 ([Pa. Super.] [ ]), *appeal denied*, [ ] 932 A.2d 74 ([Pa.] 2007) (holding that a "failure to offer a timely and specific objection results in waiver of" the claim). Therefore, we shall consider any issue waived where Appellant failed to assert a timely objection.

*Commonwealth v. Baumhammers*, 960 A.2d 59, 73 (Pa. 2008). In addition "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). This is true even when an issue presents a constitutional challenge. *Commonwealth v. Jefferson*, 256 A.3d 1242, 1252 (Pa. Super. 2021).

Furthermore, as Acting Deputy Secretary found, Petitioner had an opportunity to fully examine Certification Specialist before twice indicating that he had no further questions for her. (FOF ¶¶ 48-49; Conclusions of Law ¶¶ 7-9.) Thus, we discern no error in denying Petitioner's motions.[8]

---

[8] Petitioner also argues that Mr. Ortega was powerless to appoint a designee when he had a conflict of interest as only the Governor has such authority. (Petitioner's Br. at 30-31.) However, the General Rules of Administrative Practice and Procedure contemplate someone other than "the secretary of a department" serving as the "agency head." *See* 1 Pa. Code § 31.3 (defining "agency head" as "[t]he secretary of a department, a quorum of an authority or departmental administrative board or commission or independent board or commission, or **another officer** or group of officers whose action with respect to a matter pending before the agency exhausts opportunity for administrative review within the agency and constitutes the action of the administrative agency for the purposes of Pa. Const. art. V, § 9.") (emphasis added).

**D.     Whether Petitioner was discriminated against on the basis of sexual orientation**

Petitioner next asserts that his application had been denied because of his sexual orientation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  In support of this allegation, Petitioner sets forth the following:

> [Bureau's] counsel's reaction and attempt to shut down the cross examination of [Certification Specialist] was telling when Petitioner addressed sexual orientation with [the Bureau's] witness.  Counsel objected to further questioning, and dismissively retorted, "The decision was made and you were denied . . . ."  . . . .  [The Bureau] knows Petitioner's sexual orientation and activism for equality for LGBT [(lesbian, gay, bisexual, and queer)] people. . . . .  Also [the Bureau] allowed Petitioner's initial Application to lapse without acceptable explanation.  Also, [the Bureau] was not acting upon this Application for a few months, until Petitioner's State Representative made repeated inquiries over the span of a couple months herself.

(Petitioner's Br. at 33-34 (citations omitted).)

While the Bureau does not dispute that one's sexual orientation is protected under the Civil Rights Act and the federal and state constitutions, it stresses that Petitioner's assertion he was discriminated against based upon his sexual orientation is meritless and not supported by any record evidence or information provided to it prior to the denial of Petitioner's application for an emergency permit.  (Bureau's Br. at 29.)

Our review of the certified record confirms the Bureau's representations.  There is nothing stated in Petitioner's permit application or in correspondence between the Petitioner and the Bureau pertaining thereto that reveals Petitioner's sexual orientation or would serve to support any claim of discrimination on that basis.  In fact, it was Petitioner who referenced his sexual orientation when he summarized statements made in a character reference letter written by Stephen A.

Glassman to the Disciplinary Board of the Supreme Court of Pennsylvania Hearing Committee on August 20, 2019, which was presented as part of Joint Exhibit 7 at the hearing. As Petitioner states:

> [H]e refers to the fact that I've worked on equality efforts for the gay and lesbian community, which I am an activist. I've run as an out gay public candidate for election, and I've been [a board member] on a couple gay organizations and other mainstream organizations also.

(N.T. at 16.)

By Petitioner's own admission, Mr. Glassman's correspondence makes no reference to Petitioner's sexual orientation but simply addresses Petitioner's advocacy work on behalf of LGBT individuals. Specifically, Mr. Glassman stated:

> I . . . have worked with [Petitioner] on a variety of matters related to the passage of equality legislation for LGBT individuals in the Commonwealth. . . . I found [Petitioner] to be very helpful in his advocacy efforts on behalf of inclusive Hate Crimes legislation as well as our efforts to pass nondiscrimination legislation adding "sexual orientation and gender identity of expression" to the Pennsylvania Human Relations Act.[9]

(Jt. Ex. 7.) It was Petitioner who expanded upon Mr. Glassman's narrative at the hearing to reveal he ran "as an out gay public candidate for election." (N.T. at 16.)

In addition, counsel's objection during the cross-examination of Certification Specialist pertaining to Petitioner's letters of reference previously stipulated to by the parties was in no way discriminatory but was lodged after Petitioner asked, "Did they all say I had good moral character." (N.T. at 59-61.) Thus, the Court cannot discern any discriminatory intent from the record.

---

[9] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

25

**E.     Whether    the    good    moral    character    requirement    is unconstitutionally vague**

In his final claim, Petitioner avers the requirement under the Public School Code that every professional employee thereunder be of "good moral character" is speculative, unconstitutionally vague, and, therefore, violative of due process rights under the Pennsylvania Constitution.  He reiterates his observation that "[m]any states are moving away from the subjective moral character components in licensing" and urges this Court to find the Commonwealth should do the same. (Petitioner's Br. at 38-39.)

Generally, this Court has recognized the Commonwealth has the right to license professions "in a manner so as to safeguard the interest of the public from those who are incompetent or unqualified to engage in practice."  *Allen v. Dep't of State, Bureau of Pro. & Occupational Affs., State Bd. of Accountancy*, 595 A.2d 771, 773 (Pa. Cmwlth. 1991).  For example, in the context of the Public School Code, this Court has held that a lifetime ban from employment based on a disqualifying conviction does not violate a teacher's substantive due process rights, for the purpose of the ban "is to protect students by limiting the individuals employed in the public schools of this Commonwealth to be those of 'good moral character.'"  *Croll v. Harrisburg Sch. Dist.* (Pa. Cmwlth., No. 210 M.D. 2012, filed Dec. 13, 2012), slip op. at 31.

Although the Legislature did not specifically define "good moral character" in the Public School Code, this Court previously has held that the requirement for an applicant in other state agencies to be of "good moral character" was not unconstitutionally vague and in doing so reasoned as follows:

> A law is void on its face if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Fabio v. Civ*[.] *Serv*[.] *Comm*[']*n*, . . . 414 A.2d 82, 84

26

([Pa.] 1980) (citation omitted). However, legislation will be presumed constitutional unless it "clearly, palpably and plainly" violates the constitution. *Am*[.] *Booksellers Ass*[*'*]*n, Inc. v. Rendell*, . . . 481 A.2d 919 ([Pa. Super.] 1984). A law that may appear vague on its face "may withstand a constitutional challenge if it has been narrowed by judicial interpretation, custom and usage." *Fabio*, . . . 414 A.2d at 85. Moreover, it is our obligation to adopt a reasonable construction which will save the constitutionality of a statute. *Atlantic-Inland, Inc. v. Bd*[.] *of Supervisors of W*[.] *Goshen T*[*wp.*]*,* . . . 410 A.2d 380 ([Pa. Cmwlth.] 1980).

Although good moral character was not defined by the General Assembly, we agree with the Department [of State] that the phrase has been made constitutionally certain by our courts in terms of a person lacking "moral turpitude." Good moral character is defined, in part, as including "an absence of proven conduct or acts which have been historically considered as manifestation of moral turpitude." BLACK'S LAW DICTIONARY, 693 (6th ed. 1990). Our courts have defined moral turpitude as "'anything done knowingly contrary to justice, honesty or good morals.'" *Foose v. State Bd*[.] *of Vehicle M*[*frs.*]*, Dealers* [*&*] *Salespersons,*. . . 578 A.2d 1355 ([Pa. Cmwlth.] 1990) (quoting *Moretti v. State B*[*d.*] *of Pharmacy*, . . . 277 A.2d 516 ([Pa. Cmwlth.] 1971)). From these definitions it is apparent that the two phrases, good moral character and moral turpitude, are often used together or to define each other.

*Gombach v. Dep't of State, Bureau of Comm'ns, Elections & Legis.*, 692 A.2d 1127, 1130 (Pa. Cmwlth. 1997). In reliance upon *Gombach*, we reached a similar conclusion when finding Section 6(a) of The Professional Nursing Law[10] requiring good moral character as a qualification for a license to practice nursing was not unconstitutionally vague or incapable of definition, *Sellers v. State Board of Nursing* (Pa. Cmwlth., No. 297 C.D. 2008, filed Aug. 28, 2008), slip op. at 6-7, and in *Haveman v. Bureau of Professional & Occupational Affairs*, *State Board of Cosmetology*, 238 A.3d 567, 575-76 (Pa. Cmwlth. 2020), wherein we held that "good moral character has been sufficiently defined by judicial interpretation,

[10] Act of May 22, 1951, P.L. 317, *as amended*, 63 P.S. § 216(a).

27

custom and usage so as to survive constitutional challenge. If a person has committed an act of moral turpitude, it may be determined whether that person is of good moral character." Although these cases involved different licensing statutes, the Court finds their reasoning persuasive. Accordingly, we hold the good moral character requirement in the Public School Code does not violate the Pennsylvania Constitution.

## IV. CONCLUSION

In light of the foregoing, we affirm the Acting Deputy Secretary's July 14, 2021 Adjudication and Order.

 

 

_____

**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert Philip Tuerk,            :
                   Petitioner    :
                                 :
            v.               :   No.  894 C.D. 2021
                                 :
The Pennsylvania Department  :
of Education, Bureau of School  :
Leadership and Teacher Quality,  :
Division of Certification Services,  :
                Respondent   :

# O R D E R

**NOW**, March 24, 2023, the Adjudication and Order of the Acting Deputy Secretary dated July 14, 2021, is **AFFIRMED**.

 

_____
**RENÉE COHN JUBELIRER,** President Judge